# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| Rhonn Mitchell, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>Toyota of Dallas,<br><br>Defendant. | CA No.: 3:23-cv-1278-N<br><br>Class Action<br>Jury Demanded |

# PLAINTIFF RHONN MITCHELL'S BRIEF IN SUPPORT OF HIS MOTION FOR CLASS CERTIFICATION

Respectfully submitted,

By: */s/ Chris R. Miltenberger*

Chris R. Miltenberger
Texas Bar Number: 14171200

**The Law Office of Chris R. Miltenberger, PLLC**

1360 N. White Chapel, Suite 200
Southlake, Texas 76092-4322
817-416-5060 (office)
817-416-5062 (fax)
chris@crmlawpractice.com

**Attorneys for Plaintiff**

# Contents

I. SUMMARY ........ 1

II. BACKGROUND – STATUTORY AND REGULATORY FRAMEWORK ........ 2

A. Internal Do-Not-Call Provisions ........ 2

B. Strict Liability ........ 4

III. BACKGROUND – FACTUAL ........ 4

IV. POINTS AND AUTHORITIES ........ 6

A. The requirements of Federal Rule 23 and Local Rule 23.3 are met and the classes are definable and ascertainable. ........ 6

1. The proposed classes are definable, ascertainable and satisfy LR 23.2(b)(2). ........ 7

B. The classes meet all requirements of Fed. R. Civ. P. 23(a) and LR 23.2(a-c). ........ 10

1. Numerosity – Fed. R. Civ. P. 23(a)(1) and LR 23.2(b)(1) ........ 10

2. Commonality – Fed. R. Civ. P. 23(a)(2) and LR 23.2(b)(4) ........ 11

a. Common Characteristics of Class Members – Fed. R. Civ. P. 23(a)(2) ........ 11

b. Distinguishing and Common Characteristics - LR 23.2(b)(3)-(4) ........ 13

3. Plaintiff's claims are typical of the Class Members' – Fed. R. Civ. P. 23(a)(3). ........ 14

4. Adequacy is satisfied – Fed. R. Civ. P. 23(a)(4) and LR 23.2(c). ........ 15

C. The classes meet all requirements of Fed. R. Civ. P. 23(b)(3) and LR 23.2(b)(5). 16

1. Common questions of law and fact predominate. ........ 16

a. Common issues predominate. ........ 18

b. Common evidence predominates. ........ 19

2. A class action is the superior form of adjudication – Fed. R. Civ. P. 23(b)(3). ........ 20

D. Certain requirements of LR 23.2 are further delineated. ........ 22

V. THE COURT SHOULD APPOINT CLASS COUNSEL ........ 23

VI. CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accounting Outsourcing, L.L.C. v. Verizon Wireless Pers. Commc'ns, L.P.*,
No. CIV.A.03-cv-161, 2007 WL 7087615 (M.D. La. Aug 2, 2007) ................................ 14, 15

*Alea London Ltd. v. Am. Home Servs., Inc.*,
638 F.3d 768 (11th Cir. 2011) ........................................................................................ 4

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................................................................................................... 16

*American Pipe & Const. Co. v. Utah*,
414 U.S. 538 (1974) ....................................................................................................... 21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ....................................................................................................... 17

*Bridge v. Credit One Fin.*,
294 F. Supp. 3d 1019 (D. Nev. 2018) ............................................................................ 14

*Callier v. Debt Mediators, LLC*,
No. EP-21-CV-278-DB, 2022 WL 1423622 (W.D. Tex. May 5, 2022) .................................. 4

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ............................................................................................ 21

*Castro v. Collecto, Inc.*,
256 F.R.D. 534 (W.D. Tex. 2009) .................................................................................. 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ......................................................................................................... 7

*Cordoba v. DirecTV, LLC*,
320 F.R.D. 582 (N.D. Ga. 2017) *vacated and remanded*, 942 F.3d 1259 (11th Cir. 2019) ........................................................................................................ 22

*Cranor v. 5 Star Nutrition, L.L.C.*,
998 F.3d 686 (5th Cir. 2021) .......................................................................................... 2

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .......................................................................................... 17

*DeHoyos v. Allstate Corp.*,
240 F.R.D. 269 (W.D. Tex. 2007) .................................................................................. 14, 16

*Duncan v. JPMorgan Chase Bank, N.A.*,
No. SA-14-CA-00912-FB, 2015 WL 11623393 (W.D. Tex. Oct. 21, 2015).......................... 14

*Ford v. NaturaLawn of Am., Inc.*,
No. CV 24-354 PJM, 2024 WL 3161762 (D. Md. June 25, 2024) ....................................... 13

*Frey v. First Nat'l Bank Southwest*,
602 Fed. App'x. 164 (5th Cir. 2015).................................................................*passim*

*Frey v. First Nat'l Bank Sw.*,
No. 3:11-CV-3093-N, 2013 WL 11309592 (N.D. Tex. Feb. 20, 2013), *aff'd sub nom. Frey v. First Nat. Bank Sw.*, 602 F. App'x 164 (5th Cir. 2015).................................... 21

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012)........................................................................................ 6

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
No. 07 C 5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) .............................................. 12

*Gene and Gene LLC v. Biopay LLC*,
541 F.3d 318 (5th Cir. 2008)................................................................................. 17, 20

*In Re: Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................... 12, 14

*Henderson v. Eaton*,
No. Civ.A. 01-0138, 2002 WL 10464 (E.D. La. Jan. 2, 2002) .................................. 14, 15, 24

*Horton v. Goose Creek Indep. Sch. Dist.*,
690 F.2d 470 (5th Cir. 1982)...................................................................................... 15

*Ira Holtzman, C.P.A., & Assocs. v. Turza*,
728 F.3d 682 (7th Cir. 2013)...................................................................................... 24

*Ituah by McKay v. Austin State Hosp.*,
No. A-18-CV-11-RP, 2020 WL 354949 (W.D. Tex. Jan. 3, 2020) ....................................... 11

*James v. City of Dallas, Tex.*,
254 F.3d 551 (5th Cir. 2001), *abrogated on other grounds, M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012).......................................................... 10, 14

*Jenkins v. Raymark Indus., Inc.*,
782 F.2d 468 (5th Cir. 1986)...................................................................................... 16

*John v. Nat'l Sec. Fire & Cas. Co.*,
501 F.3d 443 (5th Cir. 2007)........................................................................................ 7

*Krakauer v. Dish Network L.L.C.*,
311 F.R.D. 384 .......... 9

*Krakauer v. Dish Network, LLC*,
925 F.3d 643 (4th Cir. 2019) .......... 9, 24

*Lehocky v. Tidel Techs., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004) .......... 17

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
289 F.R.D. 674 (S.D. Fla. 2013) .......... 16

*McCormick v. 7-Eleven, Inc.*,
No. 3:06-cv-0127-N, 2009 WL 10704102 (N.D. Tex. Mar. 12, 2009) .......... 21

*Menin v Sar Market Company, Inc.*,
No. 23-CV-11918-DJC, 2024 WL 4123522 (D. Mass. Sept. 9, 2024) .......... 1

*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012) .......... 21, 22

*Mullen v. Treasure Chest Casino LLC*,
186 F.3d 620 (5th Cir. 1999) .......... 10, 16

*Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*,
No. 12-22330-CIV, 2014 WL 7366255 (S.D. Fla. Dec. 24, 2014) .......... 22

*Rotstain v. Trustmark Nat'l Bank*,
No. 3:09-CV-2384-N, 2017 WL 11662671 (N.D. Tex. Nov. 7, 2017) .......... 7

*Serna v. Transp. Workers Union of Am., AFL-CIO*,
No. 3:13-CV-2469-N, 2014 WL 7721824 (N.D. Tex. Dec. 3, 2014) .......... 7, 11

*Turk v. Pershing LLC*,
No. 3:09-CV-2199-N, 2019 WL 13074697 (N.D. Tex. Mar. 21, 2019) .......... 19

*In re TWL Corp.*,
712 F.3d 886 (5th Cir. 2013) .......... 21

*Watson v. Manhattan Luxury Automobiles, Inc.*,
No. 20 CIV. 4572 (LGS), 2024 WL 4238307 (S.D.N.Y. Sept. 19, 2024) .......... 20

*Zeidman v. J. Ray McDermott & Co.*,
651 F.2d 1030 (5th Cir. 1981) .......... 11

**Statutes**

28 U.S.C. § 1331 .......... 22

28 U.S.C. § 1914(a) .......... 21

47 U.S.C. §§ 151, 227 .......... 2

47 U.S.C. § 227(b)(3)(B) .......... 13, 18

47 U.S.C. § 227(b)(3)(C) .......... 13, 18

Fair Credit Reporting Act .......... 14

Fair Debt Collection Practices Act .......... 16, 18, 21

Pub. L. No. 102–243, § 2, ¶¶ 5, 10, 105 Stat. 2394, 2394 (1991) .......... 2

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 .......... 1

Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* .......... *passim*

Tex. Bus. & Com. Code § 305-053(a) .......... 13

**Other Authorities**

47 C.F.R. § 64.1200(d) .......... 2, 4

47 C.F.R. § 64.1200(f)(5)(i) .......... 1, 9

68 Fed. Reg. 44144, 44158 ¶ 124 (2003) .......... 1

Fed. R. Civ. P. 23(a) .......... 10, 11

Fed. R. Civ. P. 23(a)(1) .......... 10, 11

Fed. R. Civ. P. 23(a)(2) .......... 11

Fed. R. Civ. P. 23(a)(3) .......... 14

Fed. R. Civ. P. 23(a)(4) .......... 15

Fed. R. Civ. P. 23(b)(3) .......... 16

Fed. R. Civ. P. 23(b)(3) .......... 20

Fed. R. Civ. P. 23(b)(3)(A)-(D) .......... 20

Fed. R. Civ. P. 23(g)(1)(A)(i-iv) .......... 23

Fed. R. Civ. P. 23(h) .......... 23

Local Rule 23.2 .......... 7, 22

Local Rule 23.2(b)(3) ........ 22

Local Rule 23.3 ........ 6

Local Rule 23.2(a-c) ........ 10

Local Rule 23.2(b)(1) ........ 10, 11

Local Rule 23.2(b)(2) ........ 7

Local Rule 23.2(b)(3)-(4) ........ 13

Local Rule 23.2(b)(4) ........ 11

Local Rule 23.2(b)(5) ........ 16

Local Rule 23.2(c) ........ 15

Local Rule 23.2(d) ........ 22

Plaintiff, Rhonn Mitchell ("**Plaintiff**" or "**Mitchell**"), requests that, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certify this Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("**TCPA**") claim and one related state law claim against Toyota of Dallas ("**Defendant**" or "**Toyota of Dallas**") as a class action of similarly situated persons.[1]

The classes are comprised of individuals that continued to receive from Defendant telemarketing text messages to their residential phone after they **opted out** of receiving additional text messages from Defendant, and by doing so should have been placed on Defendant's internal Do Not Call list.

## I. SUMMARY

The TCPA prevents telephone solicitation calls and telemarketing calls to individuals who do not want to receive them on their residential phones. To indicate his/her desire not to receive calls a consumer can do one of two things. First, register his/her residential number with the national Do Not Call Registry which tells all telemarketers that the consumer cannot be called. Once registered, no company can make solicitation calls to the consumer unless the consumer:

- Gives prior express written consent to the caller; or
- Has an "established business relationship" with the caller.

Relevant here, the second method to prevent calls to a user's residential phone is to inform any specific telemarketer that the individual no longer wishes to be called by the telemarketer. This "stop calling" request (1) revokes any consent that may have previously been given and (2) terminates any established business relationship. Once this "stop calling" request has been made, all calls from that

[1] In support of this, the Plaintiff's Brief in Support of His Motion for Class Certification, Plaintiff relies on the pleadings and other documents on file in this case to which he will cite and the evidence contained in his Appendix filed contemporaneously herewith and incorporated herein ("**Appendix**"). The Appendix includes Declarations, Copies of Deposition Testimony and other Documents. The Appendix is sequentially numbered so that reference to such information will be to the sequential page number of the Appendix. Thus a citation to supporting documents will appear as follows: App. at __, ¶___ (for declarations) or App. at __ (__:_-_)(for deposition excerpts) or App. at __ (for other documents).

particular telemarketer must stop. This is known as an "internal Do Not Call" request.

The internal Do Not Call List regulations under the TCPA require that each company maintain its own list of consumers who have requested not to receive further telemarketing calls. When a consumer asks a company to stop calling, the company must honor that request by placing the consumer on its internal Do Not Call list.

Under the TCPA the internal Do Not Call list entails the following:

- **Obligation to Honor Requests**: Once a consumer requests to be added to the company's internal Do Not Call list by opting out of receiving additional text messages, the company is required to stop making telemarketing calls to that consumer. This applies even if the consumer's number is not listed on the national Do Not Call Registry.[2]

- **Timeframe to Comply**: The company must place the consumer on the internal Do Not Call list within 30 days of the request, and the company must honor this request for at least five years.

- Once the consumer asks to be placed on the company-specific do-not-call list, the company may not call the consumer again **regardless of whether the consumer continues to do business with the company.** *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("**2003 Rule**"), 68 Fed. Reg. 44144, 44158 ¶ 124 (2003)(emphasis added).

Accordingly, if a consumer has asked a specific company to stop calling, they are to be placed on the company's internal Do Not Call list, and the company is prohibited from calling them for telemarketing purposes.[3]

For purposes of this case, it is assumed Defendant had initial consent to contact the Class Members. Each of the potential Class Members, however, opted out of receiving additional text messages from Defendant and thus made a request to be put on Defendant's internal Do Not Call list. This should

[2] Opting out of receiving additional text messages is sufficient to trigger placement on a company's internal Do No Call list. *See Menin v Sar Market Company, Inc.*, No. 23-CV-11918-DJC, 2024 WL 4123522, at *3 (D. Mass. Sept. 9, 2024)(Plaintiff's "allegations concerning repeated text messages over the course of three weeks after twice opting-out, combined with the existence of transmission reports and repeated failures to honor her opt-out requests, are sufficient to allege a violation of § 64.1200(d)(1)").

[3] Specifically, 47 C.F.R. § 64.1200(f)(5)(i) states: "The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation **even if the subscriber continues to do business with the seller.**" (emphasis added).

have stopped all further telemarketing text messages to the Class Members, **even if those Class Members continued to do business with Toyota of Dallas**. 2003 Rule at ¶ 124.

Because Toyota of Dallas continued to send uniform telemarketing text messages to Plaintiff and each of the Class Members, this case is properly maintainable as a class action.

## II. Background – Statutory and Regulatory Framework

In enacting the TCPA, Congress found that "unrestricted telemarketing can be an intrusive invasion of privacy" and a "nuisance." Pub. L. No. 102–243, § 2, ¶¶ 5, 10, 105 Stat. 2394, 2394 (1991); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021). Congress enacted the TCPA to protect consumers from certain unsolicited telephone calls and directed the Federal Communications Commission ("**FCC**") to promulgate regulations giving effect to the statute. *See* 47 U.S.C. §§ 151, 227; *Cranor,* 998 F.3d at 692.

### A. Internal Do-Not-Call Provisions

It violates the TCPA's internal Do Not Call ("**DNC**")provisions to "initiate any … call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). The regulations require entities making telemarketing calls to have a "written policy, available upon demand, for maintaining a do-not-call list" and to "inform[ ] and train[ ]" callers "in the existence and use" of their internal DNC lists. § 64.1200(d)(1)–(2). Not only must telemarketers have a compliant policy, but they must follow it. DNC requests must be honored within 30 days (§ 64.1200(d)(3)), and an established business relationship ("**EBR**")[4] is not an exception

[4] An EBR is defined as follows:

> (5) The term established business relationship for purposes of telephone solicitations means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of

to a company-specific internal DNC request. The FCC writes:

> As discussed earlier, companies will be permitted to call consumers with whom they have an established business relationship for a period of 18 months from the last payment or transaction, even when those consumers are registered on the national do-not-call list, as long as a consumer has not asked to be placed on the company's do-not-call list. **Once the consumer asks to be placed on the company-specific do-not-call list, the company may not call the consumer again regardless of whether the consumer continues to do business with the company.** This will apply to all services and products offered by that company. **If the consumer continues to do business with the telemarketer after asking not to be called ... the consumer cannot be deemed to have waived his or her company-specific do-not-call request.** As described above, we amend the company-specific do-not-call rules to apply to "any call for telemarketing purposes" to make clear that a company must cease making telemarketing calls to any customer who has made a do-not-call request, regardless of whether they have an EBR with that customer. **We also adopt a provision stating that a consumer's do-not-call request terminates the EBR for purposes of telemarketing calls even if the consumer continues to do business with the seller.**

2003 Rule at ¶ 124 (2003)(emphasis added).

The application of the EBR rule is central to this case. Assane Faye, Defendant's contracted Vice President of Marketing[5] testified that if, after opting out and requesting to be placed on Toyota of Dallas' internal Do Not Call list, the consumer **re-initiates contact** with the dealership, that contact **resets the established business relationship** and Defendant can then send more telemarketing text messages to the consumer. App. at 68-69 (135:7-23). He also testified that when a customer calls the dealership after opting out (regardless of the nature/content of the call), the dealer's text messaging system identifies the phone number and automatically deletes the consumer's internal Do Not Call list status. App. at 68-69 (53:11-25; 54:1-12). This illegally allows additional text messages to be sent to the consumer.

---

> the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

Section 64.1200(f)(5); 2003 Rule, ¶ 80 (2003) (An EBR "permits telemarketers to call consumers registered on the national do-not-call list.").

[5] Assane Faye is employed by Berkshire Hathaway, who is contracted to perform the marketing for Toyota of Dallas and approximately 85 other dealerships. App. at 57 (8:11-25; 9:1-4).

Mr. Faye testified that under this policy when Mr. Mitchell called the dealership to complain about the unwanted text messages he was receiving, the system would have recognized his number and automatically removed his internal Do Not Call list status. App. at 69 (54:14-25; 55:1-8).

This policy is in direct violation of the FCC rules referenced above. There is no resetting the established business relationship. Stop means stop, even if the consumer continues to do business with Toyota of Dallas. Toyota of Dallas' internal Do Not Call policy and practice violates the TCPA and can be litigated here on a class-wide basis.[6]

### B. Strict Liability

"The TCPA is essentially a strict liability statute … [and] does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) (citations omitted).

## III. Background – Factual

Toyota of Dallas is an automobile dealership in the D/FW Metroplex. It has a written policy that its salespeople must make a minimum of 50/100 outbound phone calls daily. App. at 99. The policy informs the salesperson that, "**you are a telemarketer until you are sitting in front of a customer**." App. at 99 (emphasis added). Ricardo Guajardo, a salesperson employed by Toyota of Dallas for approximately 20 years, testified that he might call/text a former customer who has not bought a car for five years. App. at 43, (60:15-25; 61:1-4). He testified that "[e]very three years is perfect. Because that way they don't forget you." App. at 43, (61:1-4). He testified that he would call or text even though "that would be somebody that [he] might not have talked to for three years since [he] sold them the car." App. at 43-44, (61:25; 62:1-6).

This is in fact what occurred with Mr. Mitchell. In 2018 he bought a used car from Toyota of

6 The TCPA's private right of action is applicable to claims under 47 C.F.R. § 64.1200(d). *See Callier v. Debt Mediators, LLC*, No. EP-21-CV-278-DB, 2022 WL 1423622, at *3 (W.D. Tex. May 5, 2022).

Dallas. App. at 5, ¶ 14. Thus, he was in Toyota of Dallas' database and began receiving telemarketing solicitations from Toyota of Dallas.

On January 30, 2020, Mr. Mitchell received a text message from Toyota of Dallas and then opted out of receiving any additional messages from Toyota of Dallas. App. at 3, ¶ 5. That same day he received a confirmation text message stating "Toyota of Dallas: You've been unsubscribed and will no longer receive messages. For questions call 1-888-988-6444," App. at 3, ¶ 6.

On March 29, 2021, Mr. Mitchell again opted out from receiving any additional messages from Toyota of Dallas. App. at 3, ¶ 7. That day he received a text message from Defendant that stated: "Toyota of Dallas: You've been unsubscribed and will no longer receive messages. For questions call (866) 636-9571". App. at 3, ¶ 8. Yet, Toyota of Dallas continued to text Mr. Mitchell. App. at 3, ¶ 9.

Despite the fact that Mr. Mitchell initiated no contact with Toyota of Dallas after he opted out on March 29, 2021, he received additional text messages on 11-28-2022, 12-19-2022, 12-30-2022, 1-12-2023, 2-11-2023, 2-18-2023, and 2-22-2023. App. at 3, ¶ 9. Each of these text messages stated: "Hi Rhonn, it's Alejandra Gomez at Toyota of Dallas. Is texting the most convenient way of communicating with you? Reply YES to allow. Reply HELP for help. Msg & data rates may apply. Reply STOP to cancel."[7] App. at 4, ¶ 10.

Because Mr. Mitchell did not consent to receive these text messages from Defendant (App. at 4, ¶ 12), and specifically requested not to received additional text messages from Defendant and thus to be put on Defendant's internal Do Not Call list, these text messages violate the TCPA and the internal Do Not Call regulations.

Data produced in discovery confirms that Defendant did this with approximately 1,539 other consumers who also previously opted out and requested that they be placed on Defendant's internal Do

[7] Mr. Mitchell also received numerous telephone phone calls from Toyota of Dallas. *See* Plaintiff's First Amended Complaint, Dkt. 13, ¶ 7.14.

Not Call list. App. 180, ¶ 82. Approximately 16,456 text messages were sent to these individuals after they opted-out and requested that the messages stop. App. 180, ¶ 82. One of the following three text messages was sent to each of these Class Members.

- Hi [customer name], it's [salesperson] at Toyota of Dallas. Is texting the most convenient way of communicating with you? Reply YES to allow. Reply HELP for help. Msg & data rates may apply. Reply STOP to cancel
- Toyota of Dallas is confirming request to send a message, reply YES to allow. Reply HELP for help. Msg & data rates may apply. Reply STOP to cancel
- [Salesperson] from Toyota of Dallas is confirming request to send a text message for your convenience. Reply YES to allow. Reply HELP for help. Msg & data rates may apply. Reply STOP to cancel

App. 168-69, ¶ 75.

For example, the individual identified as "Entity ID 6160907, received 110 text messages after opting out. App. 147, Exhibit 15. The individual identified as "Entity ID 4832621, received 71 text messages after opting out. App. 147, Exhibit 15. The individual identified as "Entity ID 3285837, received 68 text messages after opting out. App. 147, Exhibit 15.

Whether those consumers continued to do business with Toyota of Dallas is not relevant. The opt out and internal Do Not Call request trumps any allegation of an established business relationship. As a result, this case is perfectly situated for class action resolution.

## IV. Points and Authorities

### A. The requirements of Federal Rule 23 and Local Rule 23.3 are met and the classes are definable and ascertainable.

In conducting the necessary Rule 23 analysis, courts must consider the "relevant claims, defenses, facts, and substantive law presented in the case." *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345-46 (5th Cir. 2012)(citations omitted). The Supreme Court has consistently stated that it "may be necessary for the [trial] court to probe behind the pleadings before coming to rest on the certification

question," and that certification is proper only if, after rigorous analysis, the court confirms that Rule 23 is satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations and citations omitted); *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384-N, 2017 WL 11662671, at *2 (N.D. Tex. Nov. 7, 2017)(internal quotations and citations omitted).

This Court recognizes that although the Court does not consider the merits of the plaintiffs' claims in determining whether to certify the proposed class, the Court must consider the "the nature and range of proof necessary to establish the plaintiffs' substantive allegations" if it is adequately to conduct the rigorous analysis called for under Rule 23. *Serna v. Transp. Workers Union of Am., AFL-CIO*, No. 3:13-CV-2469-N, 2014 WL 7721824, at *1 (N.D. Tex. Dec. 3, 2014)(internal quotations and citation omitted).

Here, Plaintiff has met the above standards. A behind the curtain look at Defendant's telemarketing policies shows these policies violate the internal Do Not Call list provisions of the TCPA and its implementing regulations.

### 1. The proposed classes are definable, ascertainable and satisfy LR 23.2(b)(2).

A party moving for class certification must meet the requirements of Federal Rule of Civil Procedure 23 and Local Rule 23.2, and demonstrate that the proposed class is definable and ascertainable. Plaintiff and the proposed Classes meet all requirements for class certification. Local Rule 23.2(b)(2) requires a Plaintiff to state "the definition of the class and any subclasses." For certification, the proposed class "must be adequately defined and clearly ascertainable." *Frey v. First Nat'l Bank Southwest*, 602 Fed. App'x. 164, 168 (5th Cir. 2015) (*quoting Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012)); *see also John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (ascertainable class "is an implied prerequisite of" Rule 23). Plaintiff moves to certify the following classes, defined as follows:[8]

[8] Excluded from the class definitions are any employees, officers, directors of Defendant, and attorneys appearing in this case, and any judge assigned to hear this case as well as their immediate family and staff.

### Class 1 - Internal Do Not Call Request Class

> All persons in the United States (i) who received more than one telemarketing text message which was made for the purpose of encouraging the purchase of Defendant's goods or services in any twelve-month period since June 6, 2019, (ii) on a residential telephone number, (iii) where the telephone number was one for which within the previous five years the user had opted out of receiving additional messages from Defendant at the time of receiving at least one such text message, (iv) where the text message contained one or more of the phrases (a) "request to send a text message", (b) "is texting the most convenient way", or (c) "is confirming request to send a message", and (v) were received more than 31 days after the user opted out of receiving additional messages from Defendant.

### Class 2 - Texas Class[9]

> All persons in the state of Texas (i) who received more than one telemarketing text message which was made for the purpose of encouraging the purchase of Defendant's goods or services in any twelve-month period since June 6, 2019, (ii) on a residential telephone number, (iii) where the telephone number was one for which within the previous five years the user had opted out of receiving additional messages from Defendant at the time of receiving at least one such text message, (iv) where the text message contained one or more of the phrases (a) "request to send a text message", (b) "is texting the most convenient way", or (c) "is confirming request to send a message", and (v) were received more than 31 days after the user opted out of receiving additional messages from Defendant.

The standard for definability and ascertainability in this Circuit is not high. "[A]scertainability requires only that the court be able to identify Class Members at some stage of the proceeding." *Frey*, 602 Fed. App'x. at 168. "However, the court need not know the identity of each class member before certification." *Id*. (quoting William B. Rubenstein, *Newberg on Class Actions* § 3:3 (5th ed. 2011))(internal quotations omitted).

Here Toyota of Dallas informed the Court that its expert will testify regarding "the identity of and contact information for the individuals that opted out of receiving calls/texts from Defendant yet received two or more calls/texts from Defendant within a 12-month period after opting out and the manner in which Plaintiff would identify those individuals and their respective contact information." *See*

[9] The Texas class is contingent on a violation of the TCPA. Thus, it is a subset of the TCPA class but limited only to Texas residents. The Texas class provides $500 in damages per violation whereas the TCPA class provides for "up to $500" per violation. The Texas class takes away the jury's discretion in setting damages. Members of the Texas class will be identified when Defendant's expert provides contact information for the class members as required by the Court's Order. *See* Memorandum Opinion and Order, Dkt. 25 ("**Court Order**"), p. 3. If Defendant's expert violates the Court Order and does not provide the contact information, the reverse append method described herein can be used.

Defendant's Motion for Protection and Objections to Plaintiff's Notice of Deposition, Dkt. 171, p. 7-8, ¶¶ 21-23. The Court required Defendant's expert to do so. *See* Court Order Dkt. 25, p. 3. Thus, the Class Members can and will be identified through Defendant's records and Defendant's expert witness.

Even if the contact information is not produced by Defendant's expert, Plaintiff's expert has established a methodology to identify Class Members from the call logs and telephone numbers that have already been produced (at best an administrative step, if even necessary at this stage) (App. 177-186, ¶¶120-166), and has a method for distinguishing between landline and cellular numbers. App. 164-168, ¶¶ 63-73. The identification of Class Members from unique numbers, such as account numbers, or telephone numbers in this case, satisfies the ascertainability standard. *See Frey*, 602 Fed. App'x. at 168 (upholding class certification finding of ascertainability based on account numbers associated with ATM transactions).

Plaintiff anticipates that Defendant will argue the class is not ascertainable because an individual analysis regarding an established business relationship will be required. This argument misses the mark. First, because the classes are made up of consumers who have opted out and requested to be placed on Defendant's internal Do Not Call list, there can be no subsequent established business relationship after the opt out. *See* 2003 Rule at ¶ 124. Once a consumer opts out, even if he/she continues to do business with Defendant, a new established business relationship cannot be created and be used as a defense of consent by Defendant. *See Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 388 f.n. 1 (M.D.N.C. 2015), *aff'd,* 925 F.3d 643 (4th Cir. 2019)("The EBR defense does not apply to an individual's internal do-not-call request. *See* 47 C.F.R. § 64.1200(f)(5)(i)"). Thus, because Defendant's records show the individuals that opted out and, therefore, requested to be on Defendant's internal Do Not Call list, no further analysis is needed.

Even if the Court rules that a subsequent established business relationship could be created, Plaintiff's expert has analyzed all of the Lead Events and WorkNotes produced by Defendant to determine if there was any possibility of the re-creation of written consent or an established business

relationship.[10] App. 168 -172, ¶¶ 78-96. The proposed Class Members are individuals that may have had contact with Defendant after opting out as evidenced by an entry in Defendant's database, but who themselves did not **initiate** the contact and could not have been said to have re-created an established business relationship.[11]

Because proposed Class Members could not legally have re-created an established business relationship and, in any event, there is no evidence the proposed Class Members (1) gave written consent; or (2) did in fact take any action to create a subsequent established business relationship, they qualify as ascertainable Class Members.

Thus, the class is ascertainable.

### B. The classes meet all requirements of Fed. R. Civ. P. 23(a) and LR 23.2(a-c).

#### 1. Numerosity – Fed. R. Civ. P. 23(a)(1) and LR 23.2(b)(1)

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable[.]" LR 23.2(b)(1) requires an approximation of the class size.

"To satisfy the numerosity prong, 'a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported Class Members.'" *James v. City of Dallas, Tex.,* 254 F.3d 551, 570 (5th Cir. 2001) (internal quotes and citation omitted), *abrogated on other grounds*, *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (affirming class of "over 100 Class Members"). *See also Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (finding that class of 100 to 150

---

[10] In discovery Defendant was requested to identify all documents that represent (1) consent; or (2) an established business relationship. App. 108-110 (Interrogatory Number 6). Defendant identified and produced records showing Lead Events and WorkNotes. App. 138, ¶ v. (Defendant's Disclosures). Each of these spreadsheets was analyzed by Plaintiff's expert. App. 161, ¶ 47.

[11] As Plaintiff was prevented from questioning Defendant's corporate representative about the individuals with consent or an established business relationship until Defendant's expert testifies on those subjects, Plaintiff reserves the right to supplement or amend his analysis of the Lead Events and WorkNotes after Defendant's expert witness testifies. *See* p. 9-10 *supra*. Plaintiff's expert gave opinions regarding different groupings of the possible Class Members. App. 169 – 172, ¶¶ 78-96.

satisfies numerosity requirement); *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (noting approvingly of classes with as few as twenty-five members).

Here, expert analysis of the records Defendant produced reveals that approximately 1,539 individuals were sent a total of approximately 16,456 text messages in violation of the internal Do Not Call regulations.[12] App. 180, ¶ 82. As a local D/FW automobile dealership, it is believed the text messages were mainly sent to local individuals in Texas. Defendant's expert testimony will confirm the geography of where the text messages were sent. App. 175, ¶¶ 108-111. The size and geographic dispersion of the Class satisfies the numerical requirement of Rule 23(a)(1), provides the approximation required by LR 23.2(b)(1), and makes joinder impracticable. Numerosity is therefore satisfied.

**2. Commonality – Fed. R. Civ. P. 23(a)(2) and LR 23.2(b)(4)**

**a. Common Characteristics of Class Members – Fed. R. Civ. P. 23(a)(2)**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class[.]" To satisfy the second requirement of Rule 23(a), the claims of every class member must "depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Stukenberg*, 675 F.3d at 840 (quoting *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551 (2011) (internal quotations omitted)). Rule 23(a)(2) necessitates that a common issue of law or fact will resolve a central issue of each class member's claims. *Id.; Serna v. Transp. Workers Union of Am., AFL-CIO*, 2014 WL 7721824, at *3 (N.D. Tex. Dec. 3, 2014).

Even post-*Wal-Mart*, "[t]he threshold for commonality is not high: the Fifth Circuit has recognized that 'even a single common question will do.'" *Ituah by McKay v. Austin State Hosp*., No. A-18-CV-11-RP, 2020 WL 354949, at *6 (W.D. Tex. Jan. 3, 2020)(citation omitted), *report and recommendation adopted*,

[12] As with the contact information, Defendant informed the Court that its expert will testify regarding the number of individuals that opted out and **received** two or more text messages and the total number of text messages sent to those individuals. *See* Scheduling Motion, Dkt. 21, p. 7, ¶ 21. The Court ordered that Defendant's expert do so. Court Order Dkt. 25, p. 3.

No. 1:18-CV-11-RP, 2020 WL 343973 (W.D. Tex. Jan. 21, 2020). Commonality is thus satisfied if "the answers to questions about [the defendant's] alleged misconduct and the harm it caused would be common as to all of the Class Members, and would thus inform the resolution of the litigation if it were not being settled." *In Re: Heartland Payment Sys., Inc. Customer Data Security Breach Litig.,* 851 F. Supp. 2d 1040, 1054 (S.D. Tex. 2012)(citation omitted).

Because, by definition, calling programs are carried out on a mass basis, a proposed TCPA class typically contains common issues of law and fact. *See G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *4-5 (N.D. Ill. Aug. 20, 2009) (collecting cases). This TCPA case is no different.

The common questions of law and fact in this TCPA case include, but are not necessarily limited to whether:

- Defendant sent telemarketing text messages to consumers who received the text messages on their residential phones after those consumers opted out of receiving messages from Defendant and should have been placed on Defendant's internal Do Not Call list;

- Defendant's policy of continuing to send telemarketing text messages to consumers who have opted out and requested to be placed on Defendant's internal Do Not Call list, violates the internal Do Not Call regulations which state that the EBR is terminated and does not allow additional telemarketing even if the consumer continues to do business with the company. 2003 Rule, ¶ 124.

- The text messages were "telemarketing"; and

- Whether the violations were knowing and willful.

To state a claim for a defendant's purported violation of the TCPA by failing to honor a plaintiff's earlier opt-out request, a plaintiff must allege that: "(1) more than one telephone call [text message] was made to her within any 12-month period; (2) the calls were made for the purpose of encouraging the purchase or rental or, or investment in, property, goods, or services; (3) the calls were made by or on

behalf of the same entity; (4) the telemarketing entity failed to honor the recipient's prior do-not-call request; (5) and the calls occurred within a reasonable time after the date her do-not-call request was made." *Ford v. NaturaLawn of Am., Inc.*, No. CV 24-354 PJM, 2024 WL 3161762, at *7 (D. Md. June 25, 2024); § 64.1200(d)(3).

Answers to these common questions will resolve all of the issues central to the validity of each of the claims in one stroke. Because Plaintiff's and the Class Members' claims arise from the same text messaging practices of Defendant, all of the issues of law and fact are common to the Classes and can be – indeed have been – answered through discovery and by reviewing the call logs produced by Defendant. *See* App. 145-46, Expert Report of Anya Verkhovskaya. And, each Class Member suffered a common injury arising from an alleged violation of the TCPA. Therefore, certification of the Classes will produce common answers sought by the parties, including Defendant. Commonality is easily satisfied.

**b. Distinguishing and Common Characteristics - LR 23.2(b)(3)-(4)**

LR. 23.2(b)(3)-(4) is met because in virtually every way, all members of the Classes share common characteristics. Every Class Member: (i) is an individual; and (ii) received a telemarketing text message on his/her residential cellular phone after making an internal Do Not Call request by **opting out** of receiving additional messages from Defendant.

Presumably, Class Members are dispersed throughout the D/FW area. Plaintiff and each proposed Class Members have common financial incentives. Statutory damages under the TCPA are limited to $500 for each negligent violation and $1,500 for each willful violation. *See* 47 U.S.C. § 227(b)(3)(B); 47 U.S.C. § 227(b)(3)(C). The Texas state law sets damages as $500 for each negligent violation and $1,500 for each willful violation. Tex. Bus. & Com. Code § 305-053(a).

There are no relevant distinguishing factors as all Class Members opted out yet continued to receive telemarketing text messages.

**3. Plaintiff's claims are typical of the Class Members' – Fed. R. Civ. P. 23(a)(3).**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Typicality, "does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class.[13] If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James*, 254 F.3d at 571 (internal quotations and citations omitted). Here, as in another TCPA in this Circuit, typicality was satisfied where a defendant made similar unsolicited transmissions to the class "in the same manner and under the same circumstance" because that claim was typical of every class member. *See Accounting Outsourcing, L.L.C. v. Verizon Wireless Pers. Commc'ns, L.P.,* No. CIV.A.03-cv-161, 2007 WL 7087615, at *1 (M.D. La. Aug 2, 2007).

Plaintiff's TCPA claims are typical of those of the Class.[14] Because all of the Class Members were subjected to the same illegal telemarketing policies, there is no danger the Plaintiff will be preoccupied with a unique defense because the defenses here are those that will necessarily be identically applied to all Class Members.

The harm suffered by Plaintiff is identical to the harm suffered by the Class Members in that, in all instances, their statutory right to privacy was violated by Defendant when Plaintiff and the Class Members were received text messages after opting out and requesting that they be placed on Defendant's internal Do

[13] *See Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 (same). *Cf. Duncan v. JPMorgan Chase Bank, N.A.*, No. SA-14-CA-00912-FB, 2015 WL 11623393, at *3 (W.D. Tex. Oct. 21, 2015) (finding typicality satisfied in Fair Credit Reporting Act case where claims of plaintiff and settlement class "concern the same alleged [] policies and practices, arise from the same legal theories, and allege the same types of harm and entitlement to relief"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 281 (W.D. Tex. 2007) (typicality "does not focus as much on the relative strengths of the case of the named and unnamed plaintiffs as it does on the similarity of the legal and remedial theories behind their claims") (internal quotes and citation omitted); *Henderson v. Eaton,* No. Civ.A. 01-0138, 2002 WL 10464, at *3 (E.D. La. Jan. 2, 2002) ("A claim is typical if it arises from the same event or practice giving rise to the claims of other class members and is based on the same legal theory as the class members.")(citation omitted).

[14] "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Bridge v. Credit One Fin.*, 294 F. Supp. 3d 1019, 1033 (D. Nev. 2018)(internal quotations and citation omitted).

Not Call list. Each Class member claims the same statutory damages for invasion of a statutory right to privacy that resulted from Defendant's text messages.

In sum, Plaintiff is typical of the absent Class Members. Because he was allegedly subjected to the same Toyota of Dallas telemarketing practices, he suffered from the same injuries. Because of the TCPA statutory damages, both Plaintiff and the Class Members would benefit in precisely the same way from a judgment on the class claims alleged.

**4. Adequacy is satisfied – Fed. R. Civ. P. 23(a)(4) and LR 23.2(c).**

Rule 23(a)(4) requires that Plaintiff "will fairly and adequately protect the interests of the class." "This element requires that the interests of the named plaintiff are aligned with the unnamed class members to ensure that the class representative has an incentive to pursue and protect the claims of the absent class members." *Henderson*, 2002 WL 10464, at *3 (citation omitted). Local Rule 23.2(c) requires Plaintiff to address the financial responsibility to fund the action. "The adequacy requirement mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982). Adequacy is readily met here.

Mitchell readily meets the adequacy requirements because (1) his claims are representative of the proposed Classes'; (2) he is fully committed to the class (*see* App. 5-6, ¶¶ 15-19); (3) he has no conflicts with the class (*see* App. 6, ¶ 20.); and (4) he has selected proposed class counsel who is accomplished class counsel and well-suited to assume the financial responsibility to prosecute this litigation (App. 15-17, ¶¶ 2-12).

Adequacy is easily met in TCPA cases.[15] Plaintiff's TCPA claims are representative of the class for which he is seeking certification. He received telemarketing text messages after opting out and requesting

[15] Where, as here, a plaintiff asserts classwide TCPA claims, courts have found the adequacy is met. *See*, *e.g.*, *Accounting Outsourcing*, 2007 WL 7087615, at *1 ("Plaintiffs interests do not conflict with absent Class Members and Plaintiffs interests are

to be placed on Defendant's internal Do Not Call list. Thus, he is "united in asserting a common right" on behalf of the Classes and their interests are not antagonistic. *See DeHoyos,* 240 F.R.D. at 283 (*quoting In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir.1981)). Plaintiff is committed to the Class, having participated in filing the action, reviewing discovery responses, committing to sitting for a deposition and performing duties far beyond the value of his individual claim. As demonstrated in the commonality and typicality sections above, Plaintiff's interests are fully aligned with those of the Class in proving Defendant violated the TCPA and is liable for statutory damages.

### C. The classes meet all requirements of Fed. R. Civ. P. 23(b)(3) and LR 23.2(b)(5).

Under Rule 23(b)(3), a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, common questions of law and fact predominate and there are no non-common or individual issues that will be in substantial dispute at trial.

#### 1. Common questions of law and fact predominate.

Before certifying a class under Rule 23(b)(3), a court must determine that "the questions of law or fact common to Class Members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "In order to 'predominate,' common issues must constitute a *significant* part of the individual cases." *Mullen*, 186 F.3d at 626 (emphasis added); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)(emphasis added). *Frey*, 602 F. App'x at 170 (emphasis added). Federal Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

co-extensive with absent Class Members."); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 688 (S.D. Fla. 2013) (Plaintiff "will adequately represent both putative classes in this case. [Plaintiff] and the class members seek to hold Defendants liable for calling and leaving telephone messages in violation of the FDCPA and TCPA. The claims and defenses applicable to [plaintiff] and the classes appear to be substantially the same, if not identical, and there is no antagonism between [plaintiff's] interests and those of the putative class members.").

Predominance requires consideration of "'how a trial on the merits would be conducted if a class were certified.'" *Gene and Gene LLC v. Biopay LLC*, 541 F.3d 318, 326 (5th Cir. 2008)(*quoting Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)). This "'entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials.'" *Id.* (*quoting Bell Atl.*, 339 F.3d at 302); *see also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 504 (S.D. Tex. 2004) (citation omitted). However, Plaintiff need not show he will *prevail* on predominantly common issues; only that he can offer common evidence to prove his claims. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013)(emphasis added). It is enough if common issues predominate in the case *as a whole*; proof of each element need not be predominantly common. *See Amgen*, 568 U.S. at 469 ("Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." )(emphasis in original)(internal quotations and citation omitted). Where, as here, the Defendant's liability under the statute at issue is the central question, predominance can be established on that basis alone. *See In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014)("[T]he predominance inquiry can . . . be satisfied under Rule 23(b)(3) if the proceedings are structured to establish 'liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual Class Members.'")(citations omitted); *Lehocky*, 220 F.R.D. at 504 (When deciding predominance, "courts focus on issues relating to the defendants' liability. If the liabilities are common to the class, common questions are held to predominate over individual questions.")(internal citations omitted).

Plaintiff establishes predominance in two independently sufficient ways: common issues predominate as a whole; and common issues predominate as to each component of Plaintiff's and the Class Members' claim. This litigation will focus overwhelmingly on common issues, generally the Defendant's telemarketing policies and specifically the telemarketing text messages made by Toyota of Dallas after Plaintiff

and the Class Members opted out. Plaintiff also establishes predominance by showing that he will prove Defendant's violations regarding the Class Members using common evidence. In fact, the evidence for all of the elements of Plaintiff's case is exactly the same, *i.e.*, Defendant's records show that it sent text messages to individuals that previously opted-out and requested to be placed on Defendant's internal Do Not Call list. *See* App. 145.

**a. Common issues predominate.**

The central question here is whether the text messages made by Toyota of Dallas violate the TCPA. *See generally Castro v. Collecto, Inc.*, 256 F.R.D. 534, 543 (W.D. Tex. 2009)(finding predominance was satisfied in Fair Debt Collection Practices Act class action where "[t]he central issue [was] . . . whether Defendants' practice of mailing the letter to the members of the class violated the FDCPA"). To establish Defendant's liability at a trial on the merits, Plaintiff must show that Defendant sent telemarketing text messages to individuals that previously opted-out and requested to be placed on Defendant's internal Do Not Call list. This liability issue controls entirely the outcome of this case, is common to the Classes, and would be present in each of any individual cases if tried individually. *See Frey*, 602 Fed. App'x. at 169-70. This common question predominates over any individual issue and not only can – but, as Defendant's own records testimony establishes, have – been answered here.[16] App. 145. This issue will control the outcome of this case, is common to the Classes, and is consequently predominant.

To the extent Defendant argues that the possibility of a re-creation of a subsequent established business relationship will predominate, again that argument, as discussed in the ascertainability section, misses the mark. *See* discussions *supra* Sections II.A and IV.A.1. As stated above, an established business

[16] After Plaintiff successfully establishes Defendant's liability, he can attempt to prove an additional common damages question, whether Defendant's violations were knowing or willful. Regardless of the outcome, damages will still be calculated on a common basis pursuant to the TCPA's statutory scheme of $500 for each negligent violation and $1,500 for each willful violation. *See* 47 U.S.C. § 227(b)(3)(B); 47 U.S.C. § 227(b)(3)(C).

relationship cannot be re-created once a consumer opts out and requests to be placed on Defendant's internal Do Not Call list. *See id.* Even if an established business relationship could be re-created, expert analysis of Defendant's data shows (1) the lack of existence of any WorkNotes that could be alleged to have re-created the established business relationship; and (2) the lack of any Lead Event that could be used to established written consent. *See* discussion *supra* Section IV.A.1.

Additionally, whether the text messages sent by Defendant constitute "telemarketing" can be determined on a class-wide basis as one of the three text messages was sent to each of the Class Members. *See supra* Section III. To the extent the Court determines the text messages do not constitute telemarketing, that determination can be made on a class-wide basis.

**b. Common evidence predominates.**

The evidence presented at trial will be written data contained in Defendant's call detail records. App. 145. The evidence is uniform, and copies of the uniform opt outs and telemarketing text messages have been produced. No oral representations need be analyzed. *See Turk v. Pershing LLC*, No. 3:09-CV-2199-N, 2019 WL 13074697, at *2 (N.D. Tex. Mar. 21, 2019).

Common evidence necessary here for trial falls into two categories: evidence of Toyota of Dallas' telemarketing text messages sent to Class Members as determined from Defendant's call logs and whether any individuals previously opted-out and requested to be placed on Defendant's internal Do Not Call list, again determined from Defendant's call logs. *See* App. 145. Additionally, common evidence of the willfulness of Defendant's violations will also be necessary.

Defendant's call logs are common evidence through which Plaintiff can establish liability on a class-wide basis. As discussed above, Plaintiff's expert analyzed the call logs produced by Defendant to demonstrate that Plaintiff's claims can be proven on a class-wide basis using common evidence. *See supra* Section IV.B.1. The call logs show who received two or more text messages after opting out and

requesting to be placed on Defendant's internal Do Not Call list. App. 145.[17] Additionally, the call logs show the exact text messages sent by Defendant. App. 145. The Court can make a class-wide determination if the text messages constitute telemarketing.[18] In this regard, salesperson Guajardo testified the texts were part of the sales process. App. 38, (38:11-19).

Defendant's duties to the individuals that previously opted-out and requested to be placed on Defendant's internal Do Not Call list are identical and the call logs and text messages demonstrate that Defendant violated those duties thousands of times over. Whether the violations are willful can be established by evidence that is common among all Class Members. Defendant's intentional policy of not stopping its telemarketing text messaging campaigns after an opt out and request to be placed on Defendant's internal Do Not Call list is the same for Plaintiff and all the Class Members. Therefore, as required in *Gene*, class-wide proof is available to decide the predominant common questions and mini-trials are not needed to determine these common issues. *See Gene,* 541 F.3d at 326.

**2. A class action is the superior form of adjudication – Fed. R. Civ. P. 23(b)(3).**

In determining whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, the court examines, among other things, the following factors: (1) the Class Members' interest in individually controlling their separate actions; (2) the extent and nature of existing litigation by Class Members concerning the same claims; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties of managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(A)-(D). All of those factors favor certification.

[17] Defendant's call logs show that each Class Member (1) has a notation that "Customer has opted out"; and (2) was sent a text message by Defendant stating, "Toyota of Dallas: You've been unsubscribed and will no longer receive messages. For questions call 1-888-988-6444." App. 145.

[18] *See Watson v. Manhattan Luxury Automobiles, Inc.,* No. 20 CIV. 4572 (LGS), 2024 WL 4238307, at *5 (S.D.N.Y. Sept. 19, 2024) in which the following text messages were at issue, "Good afternoon, this is Jen the service concierge from Lexus of Manhattan. Can I text you regarding the maintenance for your Honda vehicle?" Defendant's motion for summary judgment was denied on other issues and the case is moving to trial.

First, class treatment is superior to many hundreds or thousands of individual claims in a TCPA case where common issues of modest individual value for each claim predominate. Class actions thus create efficiencies in the use of judicial resources. *Frey v. First Nat'l Bank Sw.*, No. 3:11-CV-3093-N, 2013 WL 11309592, at *8 (N.D. Tex. Feb. 20, 2013) (granting class certification), *aff'd sub nom. Frey v. First Nat. Bank Sw.*, 602 F. App'x 164 (5th Cir. 2015). "A federal class action is ... designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 550 (1974).

Statutory damages under the TCPA are limited to $500 or $1,500 per violation. Therefore, absent Class Members have a minimal interest in individually controlling their separate actions, most of which would otherwise not be brought. Given limited damages relative to the costs of litigation, a class action is a superior means of adjudicating small statutory damage claims, such as TCPA claims. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386 (2012) ("The current federal district court civil filing fee is $350. 28 U.S.C. § 1914(a). How likely is it that [an individual] party would bring a $500 claim in . . . federal court?"); *see also McCormick v. 7-Eleven, Inc.*, No. 3:06-cv-0127-N, 2009 WL 10704102, at *8 (N.D. Tex. Mar. 12, 2009) (certifying class under the Fair Debt Collection Practices Act; finding "a class action is the superior method of adjudication" because "given the minimal damages likely at stake for the vast majority of individual claimants, they are unlikely to pursue individual claims" and, therefore, "a class action is the only viable remedy for most members of the proposed class"). Where, as here, the costs of litigating an individual action would exceed the expected recovery of each individual class member, such suits are commonly referred to as "negative value suits." *See In re TWL Corp.*, 712 F.3d 886, 903 (5th Cir. 2013) ("A negative value suit is a case in which the costs of enforcement in an individual action would exceed the expected individual recovery."). "The most compelling rationale for finding superiority in a class action" is "the existence of a negative value suit[.]" *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996). *See also In re TWL Corp.,* 712 F.3d at 903.

Courts thus routinely find that TCPA cases, such as this negative value suit, meet the superiority requirement.[19]

Second, the extent of the existing litigation favors certification. Plaintiff has demonstrated dedication to the pursuit of his claims on behalf of absent Class Members who, if they pursued individual litigation, would seek identical information proof. Third, even though the Class Members may live in multiple federal districts in Texas (most likely the Northern and Eastern), as Defendant is based in this District, it is desirable and efficient to concentrate the class-wide resolution of TCPA claims here. Finally, Class treatment will also be more manageable and efficient than numerous other individual actions litigating the same issues with the same proof. Therefore, a class action is superior to other available methods for fairly and efficiently adjudicating Defendant's alleged violations of the TCPA.

**D. Certain requirements of LR 23.2 are further delineated.**

Local Rule 23.2 of this Court sets forth certain information that must be included in this, the Plaintiff's Brief. In addition to the information included above which sets forth requisites of subsections 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff includes here additional information regarding the proposed class action and required by Local Rule 23.2. In accordance with Local Rule 23.2(b)(3), Plaintiff shows the Court the following common characteristics of the putative classes:

- Jurisdictional amount: A jurisdictional amount per LR 23.2(d) is not required because subject matter jurisdiction is based on 28 U.S.C. § 1331, as Plaintiff's claims arise under the TCPA, a federal statute. *See Mims*, 565 U.S. at 376-77.

- Geography: The putative Class Members are potential and actual customers of Toyota of Dallas, an automative dealership located in Dallas, Texas. Thus, the Class Members are believed to be persons dispersed throughout the Dallas-Ft. Worth and surrounding

[19] *Cordoba v. DirecTV, LLC*, 320 F.R.D. 582, 602 (N.D. Ga. 2017) *vacated and remanded,* 942 F.3d 1259 (11th Cir. 2019) (certifying TCPA class finding "a class action is superior to other methods"); *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, No. 12-22330-CIV, 2014 WL 7366255, at *9 (S.D. Fla. Dec. 24, 2014) ("TCPA classes are routinely certified" because "large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims' all point toward the superiority of a class action." (citation omitted)).

metropolitan area.

- Time: All Putative Class Members received text messages from Defendant during the period beginning June 6, 2019, and ending with the date of class certification. *See supra* Section IV.A.1.

- Common Financial Incentives: If the Court determines that Defendant violated the TCPA, as alleged in Plaintiff's Complaint, each putative Class Member will recover statutory damages (in a uniform amount ranging between $500 per violation or $1,500 per violation for willful and knowing violations. *See* Pl.'s First Am. Compl., Dkt. 13, ¶¶ 11.4.4, 12.5.4, 13.4.4, and 14.9.4.

In accordance with Local Rule 23.2(e) through 23.2(g), Plaintiff shows the Court the following:

- Type of Notice: Plaintiff intends that notice will be given to each individual Putative Class Member by First Class Mail, and email when available, containing the information set forth in Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure.

- Estimated Expense of Notice: Based on the number of Putative Class Members and their assumed geographic location, Plaintiff has obtained a quote from a class administration firm in the amount of $15,000.00 for notice to potential Class Members. *See* App. 19, ¶ 15.

- Source of Funds for Notice: Notice costs will be advanced by class counsel. Upon determination of certification and liability, expenses of notice are expected to be paid from the proceeds of a common fund established through settlement or judgment of this Court.

- Discovery necessary for class certification hearing: As Defendant has not produced its expert witness/reports Plaintiff does not yet know what, if any, additional discovery is required to conduct a class certification hearing. Therefore, Plaintiff reserves the right to offer new testimony or as yet produced evidence at the hearing.

- Arrangements for Payment of Plaintiff's attorney's fees: Attorney's fees are purely contingent and subject to court approval. *Accord* Fed. R. Civ. P. 23(h). Upon determination of certification and liability, Attorney's fees and costs are expected to be paid from the proceeds of a common fund established through settlement or judgment of this Court.

## V. The Court Should Appoint Class Counsel

The Court should appoint class counsel who will "fairly and adequately" represent the Class. Plaintiff seeks appointment of The Law Office of Chris R. Miltenberger, PLLC as class counsel pursuant to Fed.

R. Civ. P. 23(g)(1)(A)(i-iv) (enumerating factors); *see also Henderson*, 2002 WL 10464, at *3 (To adequately represent the class, "counsel must be qualified, experienced, and able to prosecute the action vigorously."). Miltenberger is well suited to serve as class counsel because he has vigorously litigated this case on behalf of Plaintiff and the proposed Class. Miltenberger has successfully litigated class and collective actions in the United States, including TCPA and employment related class/collective actions. App. 16-17, ¶¶ 6-10. Miltenberger has the resources necessary to litigate cost intensive class actions and has committed to do so here. App. 17, ¶¶ 11-12.

## VI. Conclusion

Certification of TCPA class actions is relatively commonplace, as the elements needed to prove a violation of the TCPA, and the TCPA's damages scheme, lend themselves to class-wide proof. As the Fourth Circuit explained:

> Given the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition. In enacting the law, Congress sought to deter an activity that, while pernicious and disruptive, does not trigger extensive liability in any single case. Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications.

*Krakauer v. Dish Network, LLC,* 925 F.3d 643, 656 (4th Cir. 2019); *see also Ira Holtzman, C.P.A., & Assocs. v. Turza,* 728 F.3d 682, 684 (7th Cir. 2013) ("Class certification is normal in litigation under [the TCPA], because the main questions ... are common to all recipients.").

This case is no different. Mitchell requests that his motion for class certification be granted.

## CERTIFICATE OF SERVICE

I certify that per the Court's Order at the appropriate time the parties will electronically file the above document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

By: */s/ Chris R. Miltenberger*
Chris R. Miltenberger