**UNITED STATES DISTRICT COURT**
**Northern District of Texas**
**Dallas Division**

| | | |
|---|---|---|
| Rhonn Mitchell, on behalf of himself and all others similarly situated, | § | |
| | § | |
| Plaintiff, | § | CA No.: 3:23-cv-1278-N |
| | § | |
| v. | § | |
| | § | Class Action |
| Toyota of Dallas, | § | Jury Demanded |
| | § | |
| Defendant. | § | |

**DEFENDANT'S RESPONSE BRIEF IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Respectfully submitted,

*s/ Darrell E. Davis*

DARRELL E. DAVIS (Admitted *Pro Hac Vice*)
**CLARK HILL PLC**
14850 N. Scottsdale Rd., Suite 500
Scottsdale, AZ 85254
Tel: (480) 684-1100
ddavis@clarkhill.com

JARIN K. GIESLER (Admitted *Pro Hac Vice*)
**CLARK HILL PLC**
14850 N. Scottsdale Rd., Suite 500
Scottsdale, AZ 85254
Tel: (480) 684-1100
jgiesler@clarkhill.com

FRANK J. CATALANO, State Bar No. 24052991
**CLARK HILL PLC**
2600 Dallas Parkway, Suite 600
Frisco, Texas 75034
Tel: (469) 287.3917
fcatalano@clarkhill.com

**Attorneys for Defendant**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iv

I. INTRODUCTION ........ 1

II. RELEVANT FACTUAL BACKGROUND ........ 2

A. Overview ........ 2

B. Statement of Facts ........ 6

1. TOD Receives Leads from Third-Party Vendors Where Consumers, Such As the Putative Class Members, Consent to Receiving Text Messages ........ 6

2. TOD Communicates with Its Customers and Prospects Through Its Customer Relationship Software Platform ........ 7

III. ARGUMENT ........ 8

A. Legal Standard ........ 8

B. Class Certification Fails Because Plaintiff's (Improper) Class Definitions Cannot be Ascertained Because There is no Violation of the TCPA ........ 10

C. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Numerosity Under Fed. R. Civ. P. 23(a)(1) ........ 16

D. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Commonality Under Fed. R. Civ. P. 23(a)(2) ........ 19

1. Class certification should be denied as the Plaintiff cannot prove the existence or absence of consent under the TCPA through class-wide proof ........ 22

2. Plaintiff's proposed expert methodology is fatally flawed as it ignores proposed class member's ability to redefine the scope of consent regarding texts from TOD ........ 23

E. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Typicality Under Fed. R. Civ. P. 23(a)(3) ........ 25

F. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Adequacy of Representation Under Fed. R. Civ. P. 23(a)(4) ........ 25

G. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirements Under Fed. R. Civ. P. 23(b) .......... 27

H. Expenses Associated with an Individualized Review are Fundamentally Unreasonable.......... 29

IV. CONCLUSION.......... 30

CERTIFICATE OF SERVICE .......... 31

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Aderhold v. car2go N.A., LLC* ("*Aderhold II*")
668 Fed. App'x 795 (9th Cir. 2016) ........ 13

*Allison v. Citgo Petroleum Corp.*
151 F.3d 402 (5th Cir. 1998) ........ 29

*Amchem Prods. Inc. v. Windsor*
521 U.S. 591 (1997) ........ 28

*An Phan v. Agoda Co. Pte. Ltd.*
351 F.Supp.3d 1257 (N.D. Cal. 2018) ........ 12, 13

*Balthazor v. Cent. Credit Servs., Inc.*
2012 WL 6725872 (S.D. Fla. Dec. 27, 2012) ........ 24, 25

*Barrett v. ADT Corp.*
2016 WL 865672 (S.D. Ohio Mar. 7, 2016) ........ 24, 25

*Bradford v. Sovereign Pest Control of TX, Inc.*
744 F.Supp.3d 754 (S.D. Tex. 2024) ........ 19

*Burk v. Direct Energy, L.P.*
2021 WL 4267146 (S.D. Tex. Sept. 20, 2021) ........ 22

*Califano v. Yamasaki*
442 U.S. 682 (1979) ........ 10

*Castano v. American Tobacco Co.*
84 F.3d 734 (1996) ........ 29

*Chavez v. Plan Benefit Servs., Inc.*
957 F.3d 542 (5th Cir. 2020) ........ 10, 20, 21

*Conrad v. General Motors Acceptance Corp.*
283 F.R.D. 326 (N.D. Tex. 2012) (Godbey, J.) ........ *passim*

*Crosby v. Social Security Administration*
796 F.2d 576 (1st Cir. 1986) ........ 17, 18

*Cruson v. Jackson Nat'l Life Ins. Co.*
954 F.3d 240 (5th Cir. 2020) ........ 28

*Cunningham v. CBC Conglomerate LLC*
2019 WL 7500497 (E.D. Tex. Dec. 4, 2019) ........ 19, 24

*Daniel v. Five Stars Loyalty, Inc.*
15-CV-03546-WHO, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015) ..................................... 13

*DeBremaecker v. Short*
433 F.2d 733 (5th Cir. 1970) ..................................................................................... 10

*Dunn v. Midwest Buslines, Inc.*
94 F.R.D. 170 (E.D.Ark.1982) .................................................................................... 17

*Flecha v. Medicredit, Inc.*
946 F.3d 762 (5th Cir. 2020) ....................................................................................... 9

*Gene and Gene, LLC v. Biopay, LLC*
541 F.3d 318 (5th Cir. 2008) ................................................................................ *passim*

*General Telephone Co. of Southwest v. Falcon*
457 U.S. 147 (1982)..................................................................................................... 9

*Ginwright v. Exeter Finance Corp.*
280 F.Supp. 3d 674 (D. Md. 2017) .............................................................................. 14

*Gonzales v. Cassidy*
474 F.2d 67 (5th Cir. 1973) .................................................................................. 25, 26

*Gorss Motels, Inc. v. Brigadoon Fitness Inc.*
331 F.R.D. 355 (N.D. Ind. 2019) .......................................................................... 24, 25

*Hagen v. City of Winnemucca*
108 F.R.D. 61 (D.Nev.1985) ....................................................................................... 17

*Hirsch v. USHealth Advisors, LLC*
337 F.R.D. 118 (N.D. Tex. 2020) ......................................................................... *passim*

*In re Wilborn*
609 F.3d 748 (5th Cir. 2010) ....................................................................................... 29

*Jacobs v. Quicken Loans, Inc.*
2017 WL 4838567 (S.D. Fla. Oct. 19, 2017) .......................................................... 24, 25

*John v. Nat'l Security Fire & Cas. Co.*
501 F.3d 443 (5th Cir. 2007) ....................................................................................... 10

*Kline v. Security Guards, Inc.*
196 F.R.D. 261 (E.D. Pa. 2000) ................................................................................... 17

*Krakauer v. Dish Network, L.L.C.*
311 F.R.D. 384 (M.D.N.C. 2015) ..................................................................... 13, 14, 18

*Lucoff v. Navient Sols., LLC*
981 F.3d 1299 (11th Cir. 2020) ........................................ 24

*Luedke v. Delta Airlines*
155 B.R. 327 (S.D.N.Y.1993)........................................ 17

*M.D. ex rel. Stukenberg v. Perry*
675 F.3d 832 (5th Cir. 2012) ........................................ 10, 20

*O'Sullivan v. Countrywide Home Loans, Inc.*
319 F.3d 732 (5th Circ. 2003)........................................ 9, 10

*Phan v. Agoda Co. Pte. Ltd.*
798 Fed. Appx. 157 (9th Cir. 2020)........................................ 12

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs.*
601 F.3d 1159 (11th Cir. 2010) ........................................ 29

*Sanneman v. Chrysler Corp.*
191 F.R.D. 441 (E.D. Pa. 2000)........................................ 17

*Schaevitz v. Braman Hyundai, Inc.*
2019 WL 3890219 (S.D. Fla. May 8, 2019) ........................................ 24, 25

*Steering Committee v. Exxon Mobil Corp.*
461 F.3d 598 (5th Cir. 2006) ........................................ 29

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. 338 (2011)........................................ *passim*

*Wanstrath v. Time Warner Entertainment Co., L.P.*
1997 WL 122815 (S.D.N.Y. March 17, 1997) ........................................ 17

*Warner v. First Nat. Bank*
236 F.2d 853 (8th Cir. 1956) ........................................ 25

*Weeks v. Bareco Oil Co.*
125 F.2d 84 (7th Cir. 1941) ........................................ 25

*Wick v. Twilio Inc.*
C16-00914RSL, 2016 WL 6460316 (W.D. Wash. Nov. 1, 2016)........................................ 13

**Statutes**

47 U.S.C. § 227(a)(4)........................................ 19

**Rules**

Fed. R. Civ. P. 23(a) ........................................ 8, 9

Fed. R. Civ. P. 23(a)(1) ..... 16

Fed. R. Civ. P. 23(a)(2) ..... 19

Fed. R. Civ. P. 23(a)(3) ..... 25

Fed. R. Civ. P. 23(a)(4) ..... 25, 26

Fed. R. Civ. P. 23(b) ..... 9, 27

Fed. R. Civ. P. 23(b)(1) ..... 27

Fed. R. Civ. P. 23(b)(2) ..... 23, 27

Fed. R. Civ. P. 23(b)(3) ..... 9, 27, 28

**Other Authorities**

21 F.C.C. Rcd. 3787 (F.C.C. 2006) ..... 13

23 F.C.C. Rcd. 15059 (F.C.C. 2008) ..... 13

*Class Certification in the Age of Aggregate Proof*, Nagareda, 84 N.Y.U.L.Rev. 97, 131–132 (2009) ..... 19, 20

FCC-24-24A1 (2024) ..... 15

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005* 21 F.C.C. Rcd. 3787, 3813, ¶ 49 (F.C.C. 2006) ..... 13

Manual for Complex Litig. § 21.222 (2004) ..... 16

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (the "***2003 Rule***"), 68 Fed. Reg. 44144 (2003) ..... 11, 12,14, 15

## I. <u>INTRODUCTION</u>

In this (improper) Telephone Consumer Protection Act ("TCPA") matter, class certification is inappropriate, since the individual damage claims differ, and the interest of each alleged injured person in controlling his/her case outweighs any advantage of Class adjudication, such that individual damage claims predominate. Dkt. 11 at p. 3. Instead, the claims and defenses at issue in this matter <u>*cannot*</u> proceed without a manual, and individualized, review of an astronomical amount of data (Defendant Toyota of Dallas' ("Defendant" or "TOD") business records: over 2,366,013,182 cells of data and numerous other business records. Plaintiff Rhonn Mitchell's ("Plaintiff" or "Mitchell") Motion for Class Certification, and brief in support of same, (collectively, "Plaintiff's Motion") must be denied for the following reasons: (1) a class cannot be determined because Plaintiff's (improper) class definition is not a violation of the TCPA; (2) the (non-existent) proposed class it is not so numerous that joinder of all members is impractical; (2) there are uncommon questions of fact and law at issue; (3) the claims /defense asserted are not typical of the (non-existent) class; (4) Mitchell will not fairly and adequately protect the interests of the (non-existent) class; and (5) Plaintiff has misrepresented inapplicable persuasive legal authority that <u>***does not***</u> hold, in matters like the one at bar, that "[o]nce a consumer opts out, even if he/she continues to do business with Defendant, a new established business relationship cannot be created and be used as a defense of consent in a TCPA matter (that does not involve any type of robo-dialer and has specific questions regarding individualized consent).

Egregiously, the Motion transparently conceals the <u>***universally accepted***</u> legal principle that a consumer (in a matter that <u>*does not*</u> involve unsolicited communication nor automated robo-dialer technology) can always modify/scope the scope of consent. Indeed, a consumer may

provide supplemented and/or amended instructions to a business via "any reasonable means." Dispositive to the Motion, the ***only*** way to evaluate consent in this matter, and/or the modification of same, is to undertake an in-depth individualized and manual review of each-and-every consumer at issue. Remarkably, Plaintiff's Motion, and improper proposed Class, asks this Court to shackle consumers across the United States to disallow any modification regarding the scope/terms of what they can agree to with a business (thereby fundamentally violating long-standing rights regarding the freedom to contract). As established below, this is a tortured argument that must be rejected.

## II. RELEVANT FACTUAL BACKGROUND

### A. Overview

Plaintiff has not provided, and cannot provide, a means of proving, by common evidence, that the informational text messages TOD sent to its customers/consumers seeking permission to text ("PTT") violated the TCPA. As extensively set forth in TOD's expert report of Margaret Daley[1] ("Daley Exp. Rep."), there is no systematic, automated/generalized method by which to determine if PTT were sent without proper consent. *See* Ex. A, Daley Exp. Rep. at ¶ 159. To identify potentially violative texts, the dates of each PTT must be manually compared to the date of each work note contained in TOD's business records. *Id.* These records document, among other things, text opt-in and opt-out communications, servicing dates, dealership drop ins, inbound calls, and third-party webforms filled out by the customer, each of which would need to be individually reviewed and considered by the trier of fact to determine if it provided the requisite consent for TOD to send a PTT. *Id.* at ¶¶ 88, 91, 104.

In fact, TOD's expert reviewed portions of TOD's records for a (statistically valid)

[1] Despite the full opportunity to do so, Plaintiff ***did not*** submit a rebuttal expert report to challenge Ms. Daley.

random sample of 309 telephone numbers identified by Plaintiff's expert as being part of Plaintiff's proposed class and determined that a minimum 256 (82.8%) have activity indicating these proposed members may have voluntarily reengaged with TOD or otherwise expressly consented to receive additional PTTs, may be a business telephone number not subject to the TPCA, or otherwise do not fit within the definition of Plaintiff's proposed class definition. Thus, they cannot be automatically included in Plaintiff's proposed class. *Id.* at ¶¶ 5, 159.

As of the service date of this Brief, Plaintiff has ignored almost all of TOD's customer records and contends that he can determine whether a PTT violated the TCPA by simply filtering a few limited fields of TOD's database. Plaintiff's contention is wrong. Plaintiff also incorrectly contends that any subsequently sent PTT must – as a matter of law – be a violation of the TCPA because an established business relationship can never (under any circumstances) be recreated after a putative class member opts out and is placed on TOD's internal do not call list. *See* Plaintiff's Brief, p. 9. Plaintiff is wrong once again as a consumer ***can always*** modify the scope of consent.

As discussed further below, Plaintiff's contention misses the mark and ignores the fact that putative class members can subsequently consent to receiving PTT even after first opting out, and such consent does not need to be in writing. As the Fifth Circuit and this Court have explicitly held, a finding of consent precludes liability under the TCPA. *Gene and Gene, LLC v. Biopay, LLC*, 541 F.3d 318, 328 (5th Cir. 2008); *Hirsch v. USHealth Advisors,* LLC, 337 F.R.D. 118, 128 (N.D. Tex. 2020); *Conrad v. General Motors Acceptance Corp*., 283 F.R.D. 326, 329 (2012).

As set forth in detail in TOD's expert report, with numerous actual examples, putative class members can, *after first opting out,* give their consent to receive PTT in a variety of ways,

including but not limited to: a phone conversation with a salesperson, an email, interfacing with TOD's website and/or a third-party website and asking to be contacted,[2] and/or during an in-person visit to TOD:[3] Daley Exp. Rep. (Ex. A) at ¶¶ 26-30, 36, 37, 81, 88, 91, 95, 99, 104.; Ex. 8 to Daley Exp. Rep. (Ex. B). This is not an exhaustive list. Ms. Daley identified fifteen (15) different events surrounding a PTT demonstrating consent for TOD to send a PTT to a putative class member. Daley Exp. Rep. (Ex. A) at ¶ 82; Exhibit 8 to Daley Exp. Rep. (Ex. B).

These events (defined as "lead generation events" in TOD's expert report) ***<u>are specific to each putative class member</u>***. *Id.* It is ***<u>only after understanding each unique relationship</u>*** that this Court can determine whether consent to send the PTT existed. Daley Exp. Rep. (Ex. A) at ¶ 65. This is a labor-intensive (and incredibly costly) inquiry for the Court, fact finder, and defense (as the Court can only receive the information via TOD's expert). The relevant records (an incredible amount of data) to determine such instances of consent, such as the inbound call records, work notes, service records and third-party lead data, are housed in complex and disparate data systems, which includes unstructured free text (*not susceptible to filtering*), and must be manually reviewed to understand the idiosyncratic relationship between each text recipient and TOD. *Id.* at ¶ 80. As detailed in TOD's expert report, consent <u>cannot</u> be determined through simply filtering a few data fields.[4] *Id.* at ¶ 63. Rather, to determine whether a putative

---

[2] Importantly, when consumers, such as putative class members, use such third-party websites, they must agree to the third party's privacy statement or terms of service, which ***<u>includes express written consent for car dealerships, such as TOD, to contact such consumers via text</u>***, voice messages, etc. *Id.* ¶ 30.

[3] Incredibly, almost twenty-eight percent (28%) of TOD's expert's random sample of telephone numbers included in Plaintiff's putative class contained explicit opt-in responses to TOD's PTTs. Daley Exp. Rep. (Ex. A) at ¶ 81. In fact, as Plaintiff ignores, Plaintiff himself opted in to a TOD PTT and communicated with TOD via text. *Id.* at ¶¶ 36, 38.

[4] Aside from the fact no method of filtering would be sufficient to determine consent for each class member, as set forth in TOD's expert report, Plaintiff's expert proposes an impermissible, vague and convoluted methodology that cannot be duplicated and cannot reasonably identify PTTs that violate the TCPA. Daley Exp. Rep. (Ex. A) at ¶ 53. The description of her process is incomplete and confusing and omits critical steps she must have taken to arrive at the list of telephone numbers she produces. *Id*. While Plaintiff's expert contends that 16,559 of TOD's PTTs violate the TCPA, Plaintiff's expert refused to produce a list of such messages. Instead of exercising her own

class member consented to a PTT requires ***individual inquiries*** regarding each putative class member's account and the circumstances surrounding each PTT and such member's contact with TOD.[5] *Id.* at ¶ 65.

Moreover, not all interactions between TOD and its customers are recorded on TOD's customer relationship management system, *i.e.,* the source for TOD's call logs, work notes, *etc*. Richard Guajardo Depo. Tr. (Ex. C) at 54:9-11 (Q. "So when people come in you don't put it in DealerSocket?" A. "Not every time."). This is another reason individualized review is necessary, including questioning putative class members and TOD employees. Individual issues of consent would predominate at a trial if this Court were to certify the class, and thus, Plaintiff has failed to establish, among other things, the predominance and cohesiveness requirements under Rule 23(b). The Fifth Circuit's controlling decision on putative TCPA class actions explains why:

> [T]he determinative question of whether consent can be established via class-wide proof must ... be answered in the negative. [Plaintiff] has failed to advance a viable theory of generalized proof to identify those persons, if any, to whom [defendant] may be liable under the TCPA. ... This prevents the purported class from having the required cohesiveness and defeats the predominance requirement.
> *Gene and Gene*, 541 F.3d at 329.

Here, like the Fifth Circuit's *Gene and Gene* case and this Court's decision in *Conrad*, whether a putative class member consented to receiving a Permission to Text Request is a central issue that turns on evidence specific to each class member, and thus, class-wide resolution is not

---

purported "expertise," Plaintiff's expert used search terms provided by Plaintiff's counsel to search / filter TOD's data. Anya Verkhovskaya Depo. Tr. (Ex. D), 72:19-73:7. Plaintiff's expert blindly used Plaintiff's counsel's search terms without providing any input as to whether such search terms were appropriate in searching TOD's data. *Id*. Plaintiff's expert provides no reasonable basis for determining class membership and demonstrates there is no way, absent an individualized investigation, to identify the purported class members. This would not be the first time a court finds Plaintiff's expert's methodology unreliable. Daley Exp. Rep. (Ex. A) at ¶ 52.

[5] In addition to consent, individualized review is necessary to determine whether a putative class member's telephone number was a business number, which would be excluded under Plaintiff's putative class definition. *Id.* at ¶ 112. TOD's expert found that almost twenty-one percent (21%) of her random sample included in Plaintiff's putative class were associated with a business, and thus, they would be outside of Plaintiff's class definition. *Id.* at ¶ 122.

possible. *Gene and Gene*, 541 F.3d at 328; *Conrad*, 283 F.R.D. at 329; *Hirsch*, 337 F.R.D. at 128. Plaintiff's inability to prove lack of consent or reconsent after opting out of text messages without individualized analysis and proof is fatal to both the commonality requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b). A defect in any one of these prerequisites is enough to defeat class certification. There is no doubt that the Motion should be denied.

### B. Statement of Facts

TOD is an automobile dealership that sells vehicles and provides repair and maintenance services. It also advertises vehicles and services via a website it maintains and obtains leads for vehicle sales from several sources, including, but not limited to: individuals browsing the physical inventory, individuals bringing in their car for servicing, individuals calling the dealership, purchasing leads from third-party websites, responding to internet leads, repeat consumers and referrals, and sending requested information to consumers regarding sales and promotions. Daley Exp. Rep. (Ex. A) at ¶ 23; Richard Guajardo Depo. Tr. (Ex. C) at 21:21-23; 72:11-18.

#### 1. TOD Receives Leads from Third-Party Vendors Where Consumers, Such As the Putative Class Members, Consent to Receiving Text Messages.

Frequently, TOD receives leads from third-party vendors for vehicle sales. Daley Exp. Rep. (Ex. A) at ¶ 22. Through these third-party vendors, consumers can identify vehicles they are interested in, and their contact information will be sent to an automobile dealership, such as TOD, who can then sell the vehicle to them. *Id.* at ¶ 27. Consumers voluntarily provide their contact information to third-party vendors, including their name, email, and telephone number, providing consent that this information will be distributed, and they will be contacted by calls or

text messages. *Id.* Vendors include Cars.com, Truecars.com, and Kelly Blue Books. *Id.* at ¶¶ 27-30.

Importantly, when consumers, such as putative class members, use such third-party websites, they must agree/consent to the third party's privacy statement and/or terms of service, which includes express written consent for car dealerships, such as TOD, to contact such consumers via text, voice messages, *etc.*[6] For example, Kelly Blue Book provides a policy clearly stating that "Participating Dealers," such as TOD, may contact a consumer via text, *etc.* *Id.* ¶ 30.

**2. TOD Communicates With Its Customers and Prospects Through Its Customer Relationship Software Platform.**

TOD communicates with consumer leads through emails, telephone calls, or text messages. *Id.* at ¶ 23. Defendant uses DealerSocket, a customer relationship management ("CRM") software platform, which maintains a texting platform, SocketTalk that allows TOD to communicate with consumers. Richard Guajardo Depo. Tr. (Ex. C) at 25:21-25; 34:16-18; 52:23-

---

[6] Examples of the privacy policies / terms of service (which change over time) for some of the third-party vendors that provide leads for TOD are as follows:

Cars.com, at December 9, 2024:

> By clicking here you authorize Car.com and its sellers/partners to contact you be texts/calls which may include marketing and be by an autodialer. Calls may be prerecorded. You also agree to our Privacy Notice. Consent is not required to purchase good/services. We value your privacy.

Truecars.com, at January 6, 2023:

> You acknowledge that by voluntarily providing your telephone number(s) to TrueCar Parties, you expressly agree to receive prerecorded voice messages and/or autodialed calls or text messages related to pricing and offers, vehicle financing and loans, your account, any transaction, and/or your relationship with TrueCar Parties.
>
> . . .
>
> Calls or text messages may be sent by TrueCar Parties even if your telephone number is registered on any state or federal Do Not Call list.

Kelly Blue Book, at January 9, 2023:

> By requesting an Offer, you agree that we, our service providers, and Participating Dealers may contact you, by any method that you supplied your contact information, about vehicles or other products and services that may be of interest to you. You will have to supply a phone number, but it doesn't have to be a mobile number. If you do supply a phone number, you consent to receive calls or texts at that number, whether manually or automatically dialed, from us and from Participating Dealers.

53:1; 56:12-16. Before receiving a substantive text message, TOD first sends a Permission to Text Request to its customers and prospects. Daley Exp. Rep. (Ex. A) at ¶ 23, Richard Guajardo Depo. Tr. (Ex. C) at 43:5-13. An example of a PTT reads as follows:

> **Toyota of Dallas is confirming request to send a message.**
> **Reply YES to allow. Reply HELP for help.**
> **Msg & data rates may apply**
> **Reply STOP to cancel.**

Daley Exp. Rep. (Ex. A) at ¶ 24. If the consumer replied "Yes" to TOD's opt in request, SocketTalk reports: "Customer has opted in." Richard Guajardo Depo. Tr. (Ex. C) at 42:20-43:1; 24:1-12. Alternatively, if the consumer replied "Stop," SocketTalk reports "Customer has opted out." *Id.* If a consumer replies with "Stop," SocketTalk does not permit TOD to send a text to such consumer. *Id.* at 41:10-25. Consumers can change their initial selection and opt back in to receive text messages or provide consent to receive a text message. Daley Exp. Rep. (Ex. A) at ¶ 32.

DealerSocket also stores activity logs and account notes.[7] Daley Exp. Rep. (Ex. A) at ¶ 24. TOD reaches out through SocketTalk for several reasons: a TOD sales team member may have been speaking with a customer who provided their telephone number to continue the conversation, a TOD sales member may contact an existing customer for service or sales reasons, or a customer may have provided their telephone number to a third-party vendor expressing consent to receive marketing texts. *Id.* at ¶¶ 23, 26, Richard Guajardo Depo. Tr. (Ex. C) at 46:15-22.

## III. ARGUMENT

### A. Legal Standard

[7] DealerSocket does not contain information regarding all of TOD's leads as sales team members may not record every lead into DealerSocket in circumstances such as dealership visits. Richard Guajardo Depo. Tr. (Ex. C) at 53:5-54:11.

Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23(a) imposes four prerequisites on class certification. Under Rule 23(a), the party seeking certification must demonstrate ***all*** of the below elements:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("Dukes").

These four threshold conditions are "commonly known as numerosity, commonality, typicality, and adequacy of representation." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020). If Rule 23(a) is satisfied the class action may be maintained *if* the proposed class *also* satisfies at least one of the three requirements listed in Rule 23(b). A plaintiff must also meet the requirement of Rule 23(b)(3)), which requires the court to find that questions of law or fact common to class members predominate over any questions affecting only individual members ("predominance") and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ("superiority"). Fed. R. Civ. P. 23(b)(3).

Rule 23 does not set forth a mere pleading standard; a party seeking class certification must affirmatively demonstrate compliance with the Rule. *Dukes*, 564 U.S. at 350. Certification is proper only after the trial court conducts a "rigorous analysis" that the prerequisites of Rule 23 have been satisfied. *Id*. at 350-351; *see also Conrad v. General Motors Acceptance Corp*., 283 F.R.D. 326, 328 (N.D. Texas 2012) (Godbey, J.). This might require the court to probe behind the pleadings and look at the underlying factual and legal issues comprising the plaintiff's cause of action. *Dukes*, 564 U.S. at 351 (citing *General Telephone Co. of Southwest v. Falcon*, 457

U.S. 147, 156 (1982)); *accord Conrad*, *id*. Determining whether legal issues common to the class predominate over individual issues requires the court identify the substantive issue that will control the outcome, assess which issues will predominate and whether the issues are common to the class. *See O'Sullivan v. Countrywide Home Loans, Inc*., 319 F.3d 732, 738 (5th Circ. 2003).

Finally, the moving party must also propose an appropriate class that is adequately defined and clearly ascertainable. *See John v. Nat'l Security Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970).

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). The party seeking the class certification bears the burden of establishing that the putative class meets the requirements of Rule 23. *See Conrad*, 283 F.R.D. at 328; *Hirsch*, 337 F.R.D. at 125 (citing *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012)); *see also Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545-46 (5th Cir. 2020); *Gene and Gene*, 541 F.3d at 325 (district courts must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class). Here, as set forth below, Plaintiff has not satisfied his burden of proof that class certification is warranted under the court's "rigorous analysis" standard.

### B. Class Certification Fails Because Plaintiff's (Improper) Class Definitions Cannot be Ascertained Because There is no Violation of the TCPA.

The very foundation of Plaintiff's claims and request for class certification is, in essence, based upon the argument that once a party opts out of marketing communications, he/she can <u>*never*</u> opt back in. Based on this fundamentally flawed and entirely false reading of federal law Plaintiff requests that the Court certify a class of those individuals that received messages including the phrases: (1) "request to send a text message", (2) "is texting the most convenient

way", or (3) "is confirming request to send a message." However, based on Plaintiff's own definition and the precise quoted language of the text messages, these are informational and not marketing messages, which cannot establish a viable claim under the TCPA. To make matters worse, Plaintiff's "legal support" for these claims is miscited, misquoted, and misrepresented language of the FCC and Federal Courts. Specifically, Plaintiff suspiciously removed language from the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (the "***2003 Rule***"), 68 Fed. Reg. 44144 (2003) without including an ellipsis ("…") or any other indication that language <u>*which directly refutes Plaintiffs' position*</u>, was conveniently removed from that quotation. Certainly, that language did not delete itself. Nevertheless, the very foundation of Plaintiff's request for class certification is on shaky and fractured ground. As a matter of law, the Court cannot certify Plaintiff's requested class.

Plaintiff claims that once a customer has opted out of marketing communications, he/she can never opt back in. This is not true. In support of this claim, Plaintiff cites to "2003 Rule at ¶ 124." One of the threshold issues with Plaintiff's claim is that 2003 Rule at ¶ 124 does not actually say what Plaintiff purports it to say. Rather, the cited language Plaintiff utilizes in support of his argument comes from 2003 Rule at ¶ 92. It is concerning that Plaintiff cannot correctly cite to the foundational legal principles in which he bases his argument. Nevertheless, Plaintiff continuously refers to ¶ 92 as ¶ 124. In one of the instances in which Plaintiff cites to ¶ 92 in support of his argument that a customer cannot opt back in once he/she has opted out of marketing communications is on page three (3) of his Motion. Specifically, Plaintiff utilizes a block quotation which contains a significant portion of the language of ¶ 92. However, quite suspiciously, a sentence is missing from that quotation, which Plaintiff does <u>not</u> address or utilize ellipses to indicate that it has been removed. Specifically, that removed language states as

follows: "***In some instances, however, a consumer may grant explicit consent to be called during the course of a subsequent purchase or transaction.***" *See* 2003 Rule at ¶ 92. (emphasis added). Ignoring the potential Fed. R. Civ. P. 11 implications, this language directly refutes the very claim that Plaintiff attempts to make. Rather, the FCC is clear that whether a consumer opts back in to receive additional communications is indeed a fact-specific and context-specific inquiry. *Id*.

To the chagrin of Plaintiff, numerous Federal Courts have addressed this specific issue. For instance, in *An Phan v. Agoda Co. Pte. Ltd.*, 351 F.Supp.3d 1257 (N.D. Cal. 2018)[8] the Court analyzed whether there was a viable claim and opportunity for class certifications based upon the purported common issues of fact or law among the class. Specifically, a customer completed a travel booking through a company and opted out of the company's marketing promotions. Nevertheless, the customer made subsequent bookings through this same travel website and subsequently provided his phone number and agreed to the company's terms of use and privacy policy, which explicitly stated that the customer would receive future messages from the company. These messages, that the customer received after opting out of marketing messages, contained information informing him of his booking numbers for various transactions, informed the customer that he could manage his booking through the company's app, and then provided a hyperlink to download the defendant's app. The case ultimately turned on whether the mere inclusion of information regarding the booking qualified at "marketing."

The Court concluded that it did not. The Court emphasized that in considering the claim it was important to analyze "[b]oth the context and the content of the messages… [because they] dictate th[e] result." *Id*. at 1265. In looking at the context, the Court determined that the context

[8] Which was affirmed by the Ninth Circuit. *See Phan v. Agoda Co. Pte. Ltd.*, 798 Fed. Appx. 157 (9th Cir. 2020).

of the text messages dealt with an "ongoing business transaction." *Id*. As for the content, the messages read: "Good news! Your Agoda booking [number] is confirmed. Manage your booking with our free app." *Id*. Indeed, the Court concluded that '"[n]othing in the context or content of the messages indicates that the purpose of the messages was to "encourage[e] the purchase … of … property, goods, or services,' as would be necessary for it to constitute telemarketing." *Id*. at 1266. In support of its conclusion, the Court pointed to *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, 3813, ¶ 49 (F.C.C. 2006), on reconsideration in part, 23 F.C.C. Rcd. 15059 (F.C.C. 2008) ("messages whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements for purposes of the TCPA's facsimile advertising rules"). Moreover, Plaintiff pointed to several other Federal District Court cases. *See Aderhold v. car2go N.A., LLC* ("*Aderhold II*"), 668 Fed. App'x 795, 796 (9th Cir. 2016) (holding that because the transaction was ongoing as opposed to marketing a separate product the communication did not violate the TCPA); *See Wick v. Twilio Inc.*, C16-00914RSL, 2016 WL 6460316, at *1 (W.D. Wash. Nov. 1, 2016) (holding that it was not a violation of the TCPA for sending a message to a customer who had provided his personal information and phone number in the course of ordering a free sample on a website but abandoned the order before completing it); *Daniel v. Five Stars Loyalty, Inc.*, 15-CV-03546-WHO, 2015 WL 7454260, at *1 (N.D. Cal. Nov. 24, 2015). Plaintiff's claim that some level of individualized inquiry over each class member is not required because customers cannot opt back in is not supported by federal law.

Indeed, Plaintiff continues his argument by citing to *Krakauer v. Dish Network, L.L.C.*, 311 F.R.D. 384, 388 f.n.1 (M.D.N.C. 2015) in support of his claim that "[o]nce a customer opts

out, even if he/she continues to do business with Defendant, a ***new*** established business relationship cannot be created and be used as a defense of consent by Defendant." (emphasis added). That is not what *Krakauer* discusses or stands for. Rather, Plaintiff's citation to *Krakauer* is an offhanded generalized statement of law that *existing* business relationships do not provide an exception to provide additional marketing communications after an opt out. However, what *Krakauer* does *not* stand for is that *new* business relationships do not or cannot act as a modification of the scope of an opt out. Again, as Plaintiff refused to acknowledge or include in his quotations "a consumer may grant explicit consent to be called during the course of a subsequent purchase or transaction." *See* 2003 Rule at ¶ 92.

Indeed, *Krakauer* is also distinguishable from the instant case because the plaintiff retained an expert that "used a five-step process and other information from various data vendors ***to remove calls that could not possibly result in TCPA liability***." *Id.* at 391. Here, the very nature of Plaintiff's defined class consists of either some or all individuals who received communications that are information and do not violate the TCPA. Plaintiff has entirely failed to define a readily ascertainable class. Rather, he seeks to classify thousands of individuals who may have engaged in *new* business relationships and subsequently provided explicit consent to be contacted during the course of a subsequent purchase or transaction. Plaintiff's case is haphazard and imprecise even under the very authority he utilizes to support his argument.

Much worse, the issues *Krakauer* discussed are inapplicable to the case at bar. *Krakauer* involved alleged TCPA violations concerning unsolicited advertisements or solicitations. It did not involve informational text messaging, debt collection calls, and "there was no claim of individualized consent issues. Here, there are claims of individualized consent and *Krakauer* is inapplicable. *Ginwright v. Exeter Finance Corp.,* 280 F.Supp. 3d 674, 689 (D. Md. 2017).

Indeed, the most recent interpretations of the TCPA confirm Defendant's position and contradicts Plaintiff's hypothesis. Specifically, paragraph 32 states that "if a called party has revoked consent via any reasonable means, the caller no longer has consent to make further robocalls or robo-texts to the called party ***absent instructions to the contrary from the consumer***." FCC-24-24A1 (2024) at ¶ 32. It is abundantly clear that there is not a permanent bar on subsequent communications to the consumer as Plaintiff suggests. Indeed the 2003 Rule, Federal case law, and the most recent TCPA interpretations all confirm that even after an opt out the consumer can expressly modify the scope of consent or provide entirely new consent to receive communications. It is entirely contextual. Plaintiff's attempt to put a permanent freeze in time after a singular opt out is simply unsupported by the law and lacks common sense.

Basic public policy also casts significant doubt as to Plaintiff's contentions. Specifically, if the rule actually was that a consumer could not subsequently opt back in, provide new consent via a business relationship, and/or modify the scope of his/her opt out it would ultimately infringe on the rights of those very consumers. The purpose of the TCPA is to protect consumers from unwanted and excessive marketing communications. However, if a consumer was not able to change their mind or reengage in communications with various businesses and receive (desired) marketing communications it would ultimately function as a barrier to a consumer's freedom to contract. For example, if a consumer originally approached Defendant because they were interested in a Toyota 4Runner, then subsequently opted out of any marketing communications because they had purchased a vehicle, certainly the TCPA would support a mandate on the business to respect and honor that opt out. Yet, if that same consumer approached Defendant mere months later with interest in a Toyota Land Cruiser and agreed to receive communications based upon this newfound interest, Plaintiff's position would prevent

that consumer from receiving the very information sought. This would lead to an untenable reality in which consumers would unwittingly get a *de facto* order of protection against businesses from communicating with them despite an express desire to receive information. This is the precise reality in which the law accounts for.

Indeed, this is precisely why Plaintiff's defined class is so problematic and cannot be certified. As defined, Plaintiff's purported class does not account for these practical realities or federal law. Merely receiving a subsequent communication from Defendant which inquiries about approvals to receive text messages (which does not qualify as marketing under the TCPA) entirely ignores the reality than many, if not all, of these purported members of the class renewed or modified their consent to receive specific communications whether for purposes of receiving new marketing or to complete a transaction. Indeed, Plaintiff cannot be permitted to certify this class based on such haphazard and sloppy language. If the Court were to certify same, it runs a very substantial and real risk that the majority of the class members in fact expressly consented to or modified the scope of their respective opt outs. Accordingly, this purported class requires far-to-specific and individualized analysis to qualify as a permitted class under Fed. R. Civ. P. 23. As a result, Defendant respectfully requests that the Court deny Plaintiff's motion for class certification.

### C. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Numerosity Under Fed.R.Civ.P. 23(a)(1)

Plaintiff's proposed classes are improperly defined and render the class unascertainable; therefore, Plaintiff cannot satisfy the numerosity requirement. Plaintiff proposes to certify two classes -- one nationwide and one for Texas residents. *See* Plaintiff's Brief at p. 8. Both classes are contingent on, and presume, a violation of the TCPA. A class should be defined by terms easily determined by objective criteria and not subjective or merits-based factors. *See Conrad,*

283 F.R.D. 326, 329 (5th Cir. 2012) (citing Manual for Complex Litig. § 21.222 (2004.) (footnotes omitted). Plaintiff attempts to define the classes based on number of Request to Consent texts sent after opting out of receiving texts from DOT. However, as set forth at length above the issue of individualized consent is central to whether there even is a violation of the TCPA and that requires individualized merits-based determinations. The difficulties and cost-prohibitive nature of identifying members in the proposed classes are incongruous with the administrative burden of holding mini-hearings on each proposed class member. *See Kline v. Security Guards, Inc*., 196 F.R.D. 261, 268 (E.D. Pa. 2000). "Many of the streamlining benefits that are the hallmark of a proper class action would be lost in the morass of individualized determinations of class membership. *Id*. (citing *Sanneman v. Chrysler Corp*., 191 F.R.D. 441, 445 (E.D. Pa. 2000) (denying putative class action where determining membership in class would essentially require a mini-hearing on the merits of each member's case); *Wanstrath v. Time Warner Entertainment Co., L.P.*, 1997 WL 122815, at *3 (S.D.N.Y. March 17, 1997) (certification denied, as it would "bring thousands of possible claimants whose presence will... require a multitude of mini-trials... which will be tremendously time consuming and costly"); *Luedke v. Delta Airlines,* 155 B.R. 327, 332 (S.D.N.Y.1993); *Hagen v. City of Winnemucca,* 108 F.R.D. 61, 63 (D.Nev.1985) (certification improper when it would necessitate the court "to determine whether a person's... rights had actually been violated in order to determine whether that person was a class member"); *Dunn v. Midwest Buslines, Inc.,* 94 F.R.D. 170, 171–72 (E.D.Ark.1982).

Plaintiff claims that Defendant's expert will be able to provide the identity for each individual that opted out of receiving calls/texts from Defendant by receiving two or more texts from Defendant within a 12-month period after opting out. *See* Plaintiff's Brief, p. 8. This is

untrue because there is no automated or class-wide method of proof that can identify the alleged class of people that Plaintiff seeks to represent. Daley Exp. Rep. (Ex. A) at ¶ 159. Where, as here, it would be impossible to identify class members prior to individualized fact-finding and litigation, the proposed class fails one of the basic requirements for a class action under Rule 23. *See Crosby v. Social Security Administration*, 796 F.2d 576, 579-80 (1st Cir. 1986).

One cannot presume one's way to numerosity. There is no way to analyze the data relating to TOD's Consent to Text on a class-wide basis; it requires individual analysis of each person's potential consent and re-consent to receiving information texts from TOD. Daley Exp. Rep. (Ex. A) at ¶ 159. Whether the putative class members consented to the defendants contacting them on their cell phones is not subject to generalized proof that could be found by examining certain fields in the database. *See Conrad*, 283 F.R.D. at 329. To the contrary, the putative class could have provided consent in a variety of ways, including withdrawing and re-granting consent during the course of their business with Defendants. *Id*. at 330. Plaintiff's argument that their expert has an established methodology to identify class members from call logs and telephone numbers does not take into account that many of these people may have provided some form of express consent/reconsent to text messaging. *See Krakauer*, 311 F.R.D. at 391 (the plaintiff's expert "used a five-step process and other information from various data vendors to remove calls that could not possibly result in TCPA liability.").

The Motion claims that no individualized analysis is necessary because the proposed classes are made up of consumers who have opted out of texts. This is an incorrect half-measure. Plaintiff reasons that it is impossible for "there … [to be a new] subsequent established business relationship." *Id*. (citing *Krakauer*, 311 F.R.D. at 388 n. 1. This is a misreading of *Krakauer*. The footnote relates to the EBR (existing business relationship) exception to the TCPA, not to

"express consent," which is at issue here. A consumer ***can always modify consent.***

This case solely pertains to PTT requests which are not mass "telemarketing" or "telephone solicitation" as defined by 47 U.S.C. § 227(a)(4) and there is a less stringent standard for providing prior express consent for informational messaging. *See Bradford v. Sovereign Pest Control of TX, Inc.*, 744 F.Supp.3d 754, 759 (S.D. Tex. 2024). Plaintiff and the putative class are all presumed to have expressly consented to receiving the first PTT. Moreover, it would be nonsensical to claim that an individual could never reconsent to texts or receive information from a dealership, for example, when a customer reentered the market for a car, even if previously opting out of texts. *See, e.g.*, *Cunningham v. CBC Conglomerate LLC*, 2019 WL 7500497 (E.D. Tex. Dec. 4, 2019) (a person's prior opt-out may be superseded if they affirmatively provide their number in connection with a service and continue to use that service). The authority Plaintiff cites to support Defendant's argument. Under the framework of Plaintiff's defined class, it is impossible to readily ascertain that actual number of potential class members. Indeed, it cannot be done without several mini trials simply to understand what class members exist. Accordingly, Plaintiff has not met the numerosity requirement pursuant to Fed.R.Civ.P. 23(a)(1).

### D. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Commonality Under Fed.R.Civ.P. 23(a)(2)

Plaintiff also fails to satisfy Rule 23(a)(2) for many of the same reasons he cannot establish predominance. Rule 23(a)(2) requires that there must be "questions of law or fact common to the class." *Hirsch*, 337 F.R.D. at 128 (citing Fed. R. Civ. P. 23(a)(2)). As the Supreme Court emphasized in *Dukes*, the real issue underlying "commonality" is not whether the plaintiff can raise *common questions or contentions* – which is easy – what is crucial is that there are *common answers* that can be determined on a class-wide basis through the provision of

common evidence. *Dukes*, 564 U.S. at 349 (citing *Nagareda*, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 131–132 (2009)).

Under the "heightened standards" of *Dukes*[9], "all of the class member's claims [must] depend on a common issue…whose resolution will resolve an issue that is central to the validity of each one of the class member's claims in one stroke." *Chavez*, 957 F.3d at 547 (citing *Stukenberg*, 675 F.3d at 840) (cleaned up); *accord Hirsch,* 337 F.R.D. at 128. Under this heightened standard, the court must review both the similarities and the dissimilarities among the proposed class members' claims. *Hirsch, id*. (citing *Stukenberg*, 675 F.3d at 842–44; *see also Dukes*, 564 U.S. at 351 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."); *Chavez*, 957 F.3d at 547–49)).

In *Dukes*, proof of commonality necessarily overlapped with the plaintiffs' contention that Wal-Mart engaged in a pattern or practice of discrimination and the court noted that without "some glue" holding the alleged reasons for the millions of employment decisions together "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id*. at 352. Similarly, here, as set forth in TOD's predominance argument, TOD's expert makes clear that there can be no "common" evidence that would support identification of a class as individual issues of consent and reconsent would predominate and need to be individually assessed. Daley Exp. Rep. (Ex. A) at ¶ 159.

The lack of some common evidence that could provide "class wide resolution" without individual assessment of liability or damages is fatal to a request for class certification. In

[9] Before 2011 some courts described the commonality threshold as "not high" but the *Dukes* decision "heightened the standards for establishing commonality under Rule 23(a)(2)." *Hirsch,* 337 F.R.D. at 128 (citing *Gene and Gene*, 541 F.3d at 325 and *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012) (citing *Dukes*, 564 U.S. at 350)).

*Chavez*, the Fifth Circuit reversed the district court's class certification of an ERISA action where current and former employees of a company had contracted with the defendant employee benefit service provider. They claimed that the defendant had charged excessive fees and benefitted from the various plans to the detriment of the participants. *Chavez*, 957 F.3d at 548. There were several different plans provided by the defendants and defenses raised as to whether the defendant was a fiduciary to every plan and charged excessive fees or was involved in other bad behavior. *Id*.

In reversing the district court's class certification, the Fifth Circuit criticized the district court's failure to address the warring factual contentions regarding whether there could be one class wide resolution of a common issue. Especially considering the various alleged plans with fees, structures, and assignments of responsibility. *Chavez, id*. at 549 (finding it an abuse of discretion to find commonality on such a "thin survey"; an issue "is not 'capable of class wide resolution' just because the district court, without explanation, says it is"). Similarly, Plaintiff and his expert fail to present how there could be some kind of "class wide resolution" in this case where TCPA liability is tied to each person's respective consent and revocation to being contacted.

Plaintiff alleges that one of the "common questions" is that TOD's "telemarketing policies" allegedly violate the internal Do Not Call list provisions of the TCPA. *See* Plaintiff's Brief, p. 7. But that "question" is not central to the decision of whether to certify the proposed classes. What is central is the capacity of a class wide proceeding to generate a "common answer" that can drive the resolution of the litigation. *See Dukes*, 2011 WL 2437013, at *7.

Class actions should only be certified under the TCPA when the plaintiff has advanced "a viable theory employing generalized proof to establish liability with respect to the class

involved." *Hirsch*, 337 F.R.D. at 128 (citing *Gene and Gene*, 541 F.3d at 328).[10] If a central issue to liability turns on evidence specific to each class member, then class-wide resolution is not possible. *Id*. In *Gene and Gene*, the Fifth Circuit reversed the district court's certification of a class action in a case involving faxed advertisements from the defendant allegedly in violation of the TCPA because of the required individualized proof of which class members consented and did not consent to the alleged advertisements. 541 F. 3d at 329.

A plaintiff is required to advance a theory of liability capable of establishing liability as to the entire class through "one stroke" of generalized proof that is generally from one source. *See Hirsch*, 333 F.R.D. at 128-129 (citing *Gene and Gene*, 541 F.3d at 328) (other citations omitted). Where a class action would not generate common answers to the proposed common questions and, instead, would require individualized evidence then the commonality prong is not satisfied. *Hirsch*, at 129 (citing *Gene and Gene*, 541 F.3d at 327-329).

**1. Class certification should be denied here as the Plaintiff cannot prove the existence or absence of consent under the TCPA through class-wide proof.**

It is appropriate to deny class certification in a TCPA case where, as here, the plaintiff cannot prove the existence or absence of consent under the TPCA through class-wide proof. *See Burk v. Direct Energy, L.P.*, 2021 WL 4267146 at *4, *6 (S.D. Tex. Sept. 20, 2021). Where the evidence of consent was extremely individualized and fact-intensive requiring "myriad mini-trials" such a case is not appropriate for class certification. *Id.*

The *Conrad* case reached a similar conclusion in a case brought by a plaintiff against a car lender alleging violations of the TCPA due to repeated calling on a cell phone in an attempt

[10] The *Hirsch* court recognized that *Gene and Gene* predated the heightened commonality standard employed by the *Dukes* case and was thus focused on the predominance requirements in Rule 23(b) but held that the "principles supporting predominance cited in the case apply equally to commonality." *Hirsch*, 337 F.R.D. at 128, n.3.

to collect payment. *Conrad*, 283 F.R.D. at 327. The defendant lender argued that individualized issues of consent divide the class in such a way that class certification was improper, and the Court agreed. *Id*. at 329. The *Conrad* court analyzed the issue under the Rule 23(b)(3) predominance requirement (which overlaps in significant ways with the 23(a) commonality requirement) and found that one of the substantive issues that will control the outcome of the case is whether the putative class members consented to the defendant lender to contact them by cell phone. *Id*. Because a finding of consent precludes liability under the TCPA and there was evidence that putative class members could have given their consent in a variety of different ways (and could have withdrawn and re-granted consent during the course of their business with the defendant), this Court determined that the consent issue would necessitate individual inquiries. As a result, this individual issue had the potential to separate class members from each other and the class lacked cohesiveness to certify under Rule 23(b)(2). *Id*. at 330.

Important to the *Conrad* analysis was that the Plaintiff had no evidence or methodology by which to show that other proposed members of the class had not consented to receive calls from the defendant. Plaintiff could not prove consent by examining fields in the defendant's database. *Id*. at 329-330. The defendant had evidence that putative class members could have given consent by providing cell phone numbers at the time of application, via a phone conversation with an agent, via an email, via interface with the website or an in-person field call by a skip trace agent. *Id*. at 330. Where class members claims are too dissimilar for class treatment, particularly on the issue of consent, it can defeat class certification. *See Gene and Gene*, 541 F.3d at 327-329.

**2. Plaintiff's proposed expert methodology is fatally flawed as it ignores proposed class member's ability to redefine the scope of consent regarding texts from TOD**

It is clear that when courts are considering TCPA cases that issues of consent and reconsent to receiving calls/texts are often a primary focus as consent is a complete defense to a TCPA claim. *See, e.g., Lucoff*, 981 F.3d at 1304-1305 (granting summary judgment to defendant on TCPA claim where court found that plaintiff's submission of an online demographic form authorizing defendant to contact him by telephone regarding the servicing of a student loan was "reconsent" under the TCPA even though plaintiff has orally revoked consent to be contacted by way of a phone call right before submitting that form); *Cunningham*, 2019 WL 7500497 at *7, n.9 (court is unpersuaded that defendant would be on notice of plaintiff's "opt out" from calling when he himself reengaged and sought out services from the defendant).

Plaintiff asserts that because calling programs are carried out on a mass basis, a proposed TPA class typically contains common questions of law and fact. *See* Plaintiff's Brief, p. 12. But especially under the heightened commonality standard of *Dukes* (since 2011) combined with the existing 23(b) requirement of predominance of common issues, courts within the Fifth Circuit are skeptical of attempts at class action litigation in the TCPA context. *See Gene and Gene*, 541 F.3d 318 (5th Cir. 2008) (reversing certification of a class in a TCPA case where issue of consent predominated and would require a myriad of mini trials not conducive to class relief); *Hirsch*, 337 F.R.D. 118, 128; *Conrad*, 283 F.R.D. 326 (Godbey, J.) (denying class certification in TCPA action where plaintiff failed to meet requirements of numerosity, predominance and cohesiveness because issues of consent were predominate and required individual inquiry). Cases in other jurisdictions where the issue of consent in TCPA cases was found to require individual assessment have also denied class certification for that reason. *See Balthazor v. Cent. Credit Servs., Inc.*, 2012 WL 6725872, at *4 (S.D. Fla. Dec. 27, 2012); *Schaevitz v. Braman Hyundai, Inc.*, 2019 WL 3890219, at *3 (S.D. Fla. May 8, 2019); *Barrett v. ADT Corp.*, 2016 WL 865672,

at *9 (S.D. Ohio Mar. 7, 2016); *Gorss Motels, Inc. v. Brigadoon Fitness Inc.*, 331 F.R.D. 355, 360 (N.D. Ind. 2019); *Jacobs v. Quicken Loans, Inc.*, 2017 WL 4838567, at *3 (S.D. Fla. Oct. 19, 2017).

### E. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Typicality Under Fed.R.Civ.P. 23(a)(3)

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class representative's claims. Plaintiff argues that he and the other putative class members' claims are typical because they were "subjected to the same illegal telemarketing policies" and thus received similar unsolicited transmissions to the class "in the same manner and under the same circumstances." Plaintiff's Brief at p. 14. The core issue here is the consent/revocation of consent/potential reconsent or opt in by the Plaintiff and putative class members for the PTTs the Plaintiff cannot satisfy this requirement. Plaintiff conveniently ignores the issue of consent but the exact same transmission of the Consent to Text request would not be a violation of the TCPA if the person consented to receive the texts or opted in through another connection after opting out.

### F. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirement for Adequacy of Representation Under Fed.R.Civ.P. 23(a)(4)

Adequacy of representation is a question of fact, to be raised and resolved in the trial court in the usual manner. *Warner v. First Nat. Bank*, 236 F.2d 853, 858 (8th Cir. 1956); *Weeks v. Bareco Oil Co.*, 125 F.2d 84, 93-94 (7th Cir. 1941). Initial determination that representative would be an adequate representative of class should be based on two criteria: first, representative must have common interests with the unnamed members of the class; and second, it must appear that the representative will vigorously prosecute the interests of the class through qualified counsel. *Gonzales v. Cassidy*, 474 F.2d 67, 72 (5th Cir. 1973).

Here, the adequacy of representation is a prerequisite to class action that requires both that representatives and their attorneys will competently, responsibly, and vigorously prosecute suit and that relationship of representative parties' interests to those of class are such that there is not likely to be divergence in viewpoint or goals in conduct of the suit. As stated above, Plaintiff's interests <u>*will*</u> diverge because his claims are not common. Instead, they are individualized. First, Ms. Daley found evidence that Plaintiff reengaged TOD and redefined the scope of his consent to communicate with it. Daley Exp. Rep. (Ex. A) at ¶¶ 35-42. This alone makes Plaintiff's interest diverge from other potential class members. Moreover, from a logical perspective, Plaintiff <u>*must*</u> have taken affirmative action to redefine the scope of his consent. Plaintiff redefined the scope of consent on March 27, 2021. Thereafter, Plaintiff <u>*must*</u> have either called TOD (or one of its employees) or visited the dealership, with the intent to redefine the scope of consent, because he received a free text on March 27, 2021 that read "[t]hank you. Would you give me your email so I can forward you the credit app. Thank you sir." *Id*.

Plaintiff was not forthcoming at his deposition that he modified the scope of consent. Daley Exp. Rep. (Ex. A) at ¶¶ 36. Moreover, there is evidence that communication allegations from Plaintiff may be overstated. Daley Exp. Rep. (Ex. A) at ¶¶ 39. Indeed, Plaintiff's interests diverge from other potential class members for the following reasons: (1) Plaintiff is a former customer of TOD; (2) Plaintiff, unlike many others, did not engage third-party lead sources; (3) specifically reengaged TOD, either in person or over the phone, to redefine the scope of his consent (so much so that he requested a credit application); and (4) communication involving Plaintiff and TOD appears to be overstated. Dispositively, it appears that the only common interest Plaintiff has is that he was directly contacted by TOD (communication that was not unsolicited; and did not involve robo-dialers). Class certification should fail as Plaintiff cannot

meet Fed.R.Civ.P. 23(a)(4).

### G. Class Certification Fails Because Plaintiff Cannot Satisfy the Requirements Under Fed.R.Civ.P. 23(b)

While class certification fails because Plaintiff cannot satisfy all requirements of Fed.R.Civ.P. 23(a), he also fails to satisfy Fed.R.Civ.P. 23(b) because individualized, and manual, review of is necessary. Starting with Fed.R.Civ.P. 23(b)(1), there is no risk of inconsistent or varying adjudications. Furthermore, there is no risk that adjudication of individual claims would be dispositive of other claims. As established above, there is no commonality and each potential consumer at issue has an individualized claim that can be prosecuted.

The individualized issue of consent separates class members from each other and the class lacks cohesiveness to certify under Rule 23(b)(2). *Id.* at 330. Important to *Conrad's* analysis was that the Plaintiff had no evidence or methodology by which to show that other proposed members of the class had not consented to receive calls from the defendant. Plaintiff could not prove consent by examining fields in the defendant's database. Daley Exp. Rep. (Ex. A) at ¶¶ 329-330. The defendant had evidence that putative class members could have given consent by providing cell phone numbers at the time of application, via a phone conversation with an agent, via an email, via interface with the website or an in-person field call by a skip trace agent. *Id.* at 330.

A plaintiff must also meet the requirement of Rule 23(b)(3), which requires the court to find that questions of law or fact common to class members predominate over any questions affecting only individual members ("predominance") and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ("superiority"). Plaintiff cannot establish predominance and cohesiveness under Rule 23(b)(3) because individual issues of consent would predominate at a trial. "The predominance requirement of Rule 23(b)(3), … is

far more demanding' [than commonality] because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene and Gene*, 541 F.3d at 326 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). The Court must consider what a trial would look like:

> At bottom, the [predominance] inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial. The court must go [ ] beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law. This, in turn, entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials.

*Cruson v. Jackson Nat'l Life Ins. Co*., 954 F.3d 240, 253-54 (5th Cir. 2020).

Common conduct does not establish class-wide liability here because the exact same conduct, sending a Permission to Request Text, may be perfectly legal in some instances (when the consumer has given prior express consent) and not in others (when no consent was given or consent has been withdrawn). **For this reason, in a TCPA case, "the predominant issue of fact is undoubtedly one of individual consent."** *Gene and Gene*, 541 F.3d at 327 (emphasis supplied).

Consequently, to satisfy Rule 23(b)(3) in a TCPA case, the Plaintiff <u>must</u> show how he can prove consent (or lack of consent) with common, class-wide proof. **"[P]laintiff must advance a viable theory employing generalized proof to establish liability with respect to the class involved, and ... district courts must only certify class actions filed under the TCPA when such a theory has been advanced**." *Id*. at 328. A plaintiff's inability to establish such generalized proof "prevents [a] purported class from having the required cohesiveness and defeats the predominance requirement." *Id*.

Here, individual issues of consent would predominate at a trial. Plaintiff also fails to satisfy superiority for the same reason he cannot establish predominance. "[T]he predominance of individual issues relating to the plaintiffs' claims ... detracts from the superiority of the class action device in resolving these claims." *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 604-05 (5th Cir. 2006) (*citing Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998) and *Castano*, 84 F.3d at 745); *see also In re Wilborn*, 609 F.3d 748, 755-56 (5th Cir. 2010).

The focus of this analysis [of superiority] is on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." As a result, the predominance analysis has a "tremendous impact on the superiority analysis ... for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims," both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability. The converse is also true: the less common the issues, the less desirable a class action will be as a vehicle for resolving them. *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1183-84 (11th Cir. 2010) (citations omitted).

Plaintiff cannot demonstrate his class action is the "superior" method of resolving each class member's highly individualized claims, and thus, Plaintiff's motion must be denied.

### H. Expenses Associated with Individualized Review are Fundamentally Unreasonable

While TOD's expert ultimately opines that there is no automated method by which to identify class members (because identifying same requires PTT's to be compared to the date of each work note contained in TOD's business records), she performed an in-depth individualized

analysis, that is statistically valid, regarding 309 of the alleged[11] 1,561 phone numbers at issue in this case. Daley Exp. Rep. (Ex. A) at ¶¶ 1-11, 53-54. The individualized analysis is described in her report; however, of the 309 numbers analyzed (and compared to TOD business records), 82.8% have activity indicating that a consumer may have reengaged TOD and redefined the scope of consent. 28% were associated with a business (exempt from the TCPA). Ms. Daley's analysis in this case was similar to work she has done in other cases involving car dealerships. Daley Exp. Rep. (Ex. A) at ¶¶ 6-7. Remaining numbers required additional individualized review. The problematic nature here is that Ms. Daley's review cost TOD a total of $195,032.25. *See* Ex. E "Daley Invoices"[12]. While statistically valid, this total related to 19.8% of the data in this case. Therefore, it would cost TOD a total of roughly $985,011.31 for its expert to perform an additional review. This is unduly burdensome and fundamentally unreasonable. The Court cannot, and should not, certify a class and subsequently require the defense to disqualify class participants.

## IV. CONCLUSION

For the reasons set forth above, Toyota of Dallas respectfully requests that Plaintiff's Motion for Class Certification be denied.

---

[11] As further described herein, the reasoning of Plaintiff's expert is flawed and should be precluded. The purpose of this section is to demonstrate the unreasonableness of additional individualized review that would be required.

[12] This amount does not include all of the work performed and billed by Ms. Daley; this amount is specific to reviewing, analyzing, and reporting on the 309 numbers in the statistically valid random sample.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2025, a true and correct copy of the foregoing was served via email to all counsel of record. I further certify that, per the Court's Order, and on the appropriate date, the parties will electronically file the complete briefing on Plaintiff's Motion for Class Certification, including this Response Brief in opposition to same, with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.

*/s/ Andréa L. Padinha*
**Andréa L. Padinha**